UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                   :

DISCOVERY GLOBAL CITIZENS MASTER   :
FUND, LTD., DISCOVERY GLOBAL FOCUS  :
MASTER FUND, LTD., DISCOVERY GLOBAL  :
MACRO MASTER FUND, LTD., and         :
DISCOVERY GLOBAL OPPORTUNITY     :
MASTER FUND, LTD.,                :
                                     :

              Plaintiffs,       :
                                     :

              v.             :
                                     :

PETRÓLEO BRASILEIRO S.A. - PETROBRAS, :
PETROBRAS GLOBAL FINANCE B.V., MARIA :
DAS GRAÇAS SILVA FOSTER, THEODORE  :
MARSHALL HELMS, BANK OF CHINA (HONG :
KONG) LIMITED, BB SECURITIES LTD.,   :
BANCO BRADESCO BBI S.A., and BANCA IMI :
S.P.A.,                         :
                                     :

              Defendants.     :
-------------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

Plaintiffs Discovery Global Citizens Master Fund, Ltd., Discovery Global Focus Master Fund, Ltd., Discovery Global Macro Master Fund, Ltd., and Discovery Global Opportunity Master Fund, Ltd. ("Plaintiffs") are purchasers of securities of one of the world's largest oil and gas companies, Petróleo Brasileiro S.A. - Petrobras ("Petrobras," or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, for their federal securities claims against Petrobras, Petrobras Global Finance B.V., Maria das Graças Silva Foster, Theodore Marshall Helms, Bank of China (Hong Kong) Limited, BB Securities Ltd., Banco Bradesco BBI S.A., and Banca IMI S.p.A., allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: Petrobras' filings with the U.S. Securities and Exchange Commission ("SEC"); transcripts of Petrobras conference calls; reports of securities analysts concerning Petrobras; Petrobras press releases; sworn declarations and deposition testimony provided by Paulo Roberto Costa, Pedro José Barusco Filho, and Alberto Youssef in Brazilian criminal proceedings related to a massive kickback scheme at Petrobras; Brazilian newspaper reports of testimony and statements provided by various Petrobras former employees; pleadings, motion papers, and exhibits to declarations filed in the matter *In re Petrobras Securities Litigation*, 14-cv-09662-JSR; and other public documents and media reports concerning Petrobras. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.[1]

## I.   NATURE OF THE ACTION

1.   Plaintiffs bring this action under the federal securities laws to recover for the investment losses they suffered as a result of numerous false and misleading statements made by Petrobras and its representatives concerning its financial condition, its corporate governance, and the adequacy of its internal controls. These statements were materially false and misleading because they did not reveal the existence of a massive kickback scheme at the highest levels of the Company that resulted in Petrobras radically overstating the value of its most significant assets and materially understating its costs and expenses in its financial statements.

---

[1]   Monetary amounts are presented in US dollars, using a contemporaneous exchange rate if necessary. Many of the quotations contained in this Complaint have been translated from Portuguese into English.

2.      Petrobras was founded in the 1950s by the Brazilian federal government to conduct Brazil's oil and gas activities.  Today, Petrobras is Brazil's largest public company and one of the richest oil companies in the world, with substantial operations both domestically and abroad.  Because it is controlled by the Brazilian government, the board members and executive managers of Petrobras are hand selected by Brazil's ruling political parties.

3.      At the beginning of the 21st century, Petrobras experienced an increase in production due, in part, to its discovery of new pre-salt oil reserves off the coast of Brazil.  To finance its expanding operations, Petrobras looked to the global financial markets, including the U.S. equity and debt markets, for capital.  Between 2010 and 2014, Petrobras sold billions of dollars of stocks and bonds to U.S. investors.

4.      In order to gain the trust of U.S. investors, Petrobras had to publicly represent that its financial statements were accurate and that it had a system of strong internal controls over financial reporting as well as corporate policies in place to promote ethical business practices and prevent corruption.  Petrobras repeatedly touted its ethics policy and anti-corruption measures, and even went so far as to issue a statement announcing that it had been awarded a "Transparency Trophy" by various accounting associations for twelve years in a row.  Importantly, Petrobras assured investors that its financial statements were prepared in accordance with U.S. and/or international generally accepted accounting principles.

5.      Unbeknownst to the market, however, for years Petrobras was embroiled in a massive kickback and bribery scheme involving Petrobras' senior executives, Brazil's ruling politicians, and a cartel of construction and engineering companies.  As subsequently disclosed by Petrobras itself, "senior Petrobras personnel conspired with contractors, suppliers and others .

. . to establish and implement an illegal cartel that systematically overcharged the Company in connection with the acquisition of property, plant and equipment."

6.      With the aide of Petrobras' senior executives, the cartel negated the possibility of an honest bidding process by controlling all of the parties invited to bid and making sure that all parties submitted inflated bids.   The members of the cartel conspired to determine which company would submit the winning bid for a particular Petrobras contract.   The cartel members then submitted bids to Petrobras far in excess of Petrobras' internal budget.   This tactic forced Petrobras to negotiate with the lowest bidder (who had been preselected by the cartel) to get that company to agree to a contract price at the very top of Petrobras' budget.   This practice resulted in Petrobras consistently overpaying billions of dollars for property, plants and equipment that would have cost considerably less if there had been a *bona fide* bidding process.   This resulted in a multi-billion dollar overstatement of the value of Petrobras' property, plant, and equipment on the Company's financial statements, thereby deceiving investors.

7.      To keep Petrobras' senior executives and their political godfathers happy, the "winner" of the bid was required to kickback a bribe of 3% of the contract price.   If the cartel member did not pay the kickback, it would not be invited to bid on future projects.   The Petrobras executives and the ruling politicians hired professional money launderers to deposit the bribes they received from cartel members into offshore accounts.

8.      Petrobras executives squashed any dissent from lower-level Petrobras employees who raised concerns about the impropriety of the bidding process.   To get rid of one particular potential whistleblower, Petrobras executives transferred her to Singapore.   Thus, the scheme continued undetected by the outside world for many years.

9.      The scope of the kickback and bribery scheme was enormous.  Petrobras has estimated that there were at least $81.4 billion of Petrobras contracts subject to this corrupt process.  By comparison, Petrobras' reported gross profit for the 2014 fiscal year was less than half that amount.

10.      The massive kickback and bribery scheme rendered several of Petrobras' public statements during the relevant period materially false and misleading.  In particular, Petrobras materially overstated the amount of its assets, its property, plant and equipment, its net income, and also materially understated its costs and expenses in its financial statements.  The effect of these misrepresentations was to artificially inflate the price of Petrobras' securities.

11.      The scheme at Petrobras was ultimately discovered due to a fortuitous twist in a money laundering investigation codenamed Operation "Lava Jato."  As part of that investigation, Brazilian police discovered that a known money launderer had gifted a luxury car to a former Petrobras senior executive, Paulo Roberto Costa.  Costa was arrested, and subsequently agreed to cooperate with prosecutors.  The evidence that Costa turned over to prosecutors as part of his plea deal resulted in an expansive investigation of Petrobras, its contractors, and the government, the results of which have both captivated and shocked the people of Brazil.

12.      Cooperating witnesses have provided hours of testimony and hundreds of documents to authorities as part of Operation Lava Jato.  According to the *New York Times*, as of August 7, 2015, "117 indictments have been issued, five politicians have been arrested, and criminal cases have been brought against 13 companies."  Four former Petrobras senior executives have been charged in Operation Lava Jato, and the entire senior management of Petrobras has been replaced.  Petrobras has implemented an overhaul of its internal controls and

hired a new "Executive Director of Governance, Risk and Compliance" to try and regain some semblance of legitimacy.

13.     As the truth behind Operation Lava Jato was gradually revealed, the market price of Petrobras' securities dropped precipitously.

14.     Plaintiffs purchased Petrobras American Depository Shares ("ADS") on the New York Stock Exchange ("NYSE") between April 7, 2014 and February, 2015.  Plaintiffs have suffered losses on those purchases as the truth about the massive kickback and bribery scheme, Petrobras' deficient internal controls, and their impact on Petrobras' financial condition and reported financial statements was disclosed to and digested by the market.  Plaintiffs therefore bring this action to recover the damages suffered as a result of the false and misleading statements.  Plaintiffs assert fraud claims pursuant to the Securities Exchange of 1934 in connection with their purchases of Petrobras ADS.

15.     Plaintiffs also assert separate claims under the Securities Act of 1933 in connection with their purchases in the United States in 2014 and 2015 of Petrobras Global Finance B.V. global notes unconditionally guaranteed by Petrobras.  The offering documents pursuant to which these notes were registered contained materially false and misleading statements and omissions about Petrobras' financial condition and its internal controls.  Plaintiffs have suffered losses on these notes under Section 11 of the Securities Act.  For purposes of these Securities Act claims, Plaintiffs are not alleging that Defendants committed fraud or acted with fraudulent intent, and therefore the Securities Act claims do not sound in fraud.

## II.     <u>JURISDICTION AND VENUE</u>

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule

10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77*o*.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, Section 27 of the Exchange Act and Section 22 of the Securities Act.  Petrobras maintains an office in this District and sponsors ADSs representing the Company's common and preferred equity that are listed on a stock exchange located in this District.  Furthermore, certain of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

19.     Plaintiffs assert claims premised upon the purchase of Petrobras ADS on the NYSE, and the purchase of Petrobras notes in the United States that are traceable to a registered public offering conducted in this District.

20.     Petrobras consented and submitted to the jurisdiction of this Court under Section 7.06 of the Amended and Restated Deposit Agreements governing its common and preferred shares, which were filed with the United States Securities and Exchange Commission ("SEC") on December 7, 2011.

21.     Furthermore, Petrobras, Petrobras Global Finance B.V., and the Underwriter Defendants (as defined below) agreed "that any suit, action or proceeding against them, arising out of or based upon" the March 10, 2014 Underwriting Agreement (or the transactions contemplated by the March 10, 2014 Underwriting Agreement) "may be instituted in any . . . federal court in the Borough of Manhattan, City of New York, New York, . . . and waive[d] any

objection which they may now or hereafter have to the laying of venue of any such proceeding and any right to which any of them may be entitled on account of places of residence or domicile, and irrevocably submit to the jurisdiction of such courts in any suit, action or proceeding."

22.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

### III.    PARTIES

#### A.    Plaintiff

23.     Plaintiff Discovery Global Citizens Master Fund, Ltd. is a Cayman Islands fund whose investment adviser has its main office location in South Norwalk, Connecticut.  The dates on which Discovery Global Citizens Master Fund, Ltd. purchased Petrobras ADS on the NYSE representing the Company's common equity (the "Common ADS") during the relevant period are attached hereto as Exhibit A.  The dates on which Discovery Global Citizens Master Fund, Ltd. purchased Petrobras ADS on the NYSE representing the Company's preferred equity (the "Preferred ADS") during the relevant period are attached hereto as Exhibit B.  In addition to Petrobras ADS, Discovery Global Citizens Master Fund, Ltd. purchased Petrobras Global Finance B.V. 6.250% Global Notes due 2024 unconditionally guaranteed by Petrobras (the "Citizens Notes") in the United States on the date set forth on Exhibit C.  Discovery Global Citizens Master Fund, Ltd. purchased the Citizens Notes pursuant to a March 10, 2014 Prospectus Supplement to an August 29, 2012 Shelf Registration Statement and Prospectus. Title to the Citizens Notes was transferred in the United States, as the trades were settled by United States brokers through the Depository Trust Company located in the United States.

24.     Plaintiff Discovery Global Focus Master Fund, Ltd. is a Cayman Islands fund whose investment manager has its main office location in South Norwalk, Connecticut.  The dates on which Discovery Global Focus Master Fund, Ltd. purchased Petrobras Common ADS on the NYSE during the relevant period are attached hereto as Exhibit A.  The dates on which Discovery Global Focus Master Fund, Ltd. purchased Petrobras Preferred ADS on the NYSE during the relevant period are attached hereto as Exhibit B.  In addition to Petrobras ADS, Discovery Global Focus Master Fund, Ltd. purchased Petrobras Global Finance B.V. 6.250% Global Notes due 2024 unconditionally guaranteed by Petrobras (the "Focus Notes") in the United States on the date set forth on Exhibit C.  Discovery Global Focus Master Fund, Ltd. purchased the Focus Notes pursuant to a March 10, 2014 Prospectus Supplement to an August 29, 2012 Shelf Registration Statement and Prospectus.  Title to the Focus Notes was transferred in the United States, as the trades were settled by United States brokers through the Depository Trust Company located in the United States.

25.     Plaintiff Discovery Global Macro Master Fund, Ltd. is a Cayman Islands fund whose investment adviser has its main office location in South Norwalk, Connecticut.  The dates on which Discovery Global Macro Master Fund, Ltd. purchased Petrobras Common ADS on the NYSE during the relevant period are attached hereto as Exhibit A.  The dates on which Discovery Global Macro Master Fund, Ltd. purchased Petrobras Preferred ADS on the NYSE during the relevant period are attached hereto as Exhibit B.  In addition to Petrobras ADS, Discovery Global Macro Master Fund, Ltd. purchased Petrobras Global Finance B.V. 6.250% Global Notes due 2024 unconditionally guaranteed by Petrobras (the "Macro Notes") on the date set forth on Exhibit C.  Discovery Global Macro Master Fund, Ltd. purchased the Macro Notes pursuant to a March 10, 2014 Prospectus Supplement to an August 29, 2012 Shelf Registration

Statement and Prospectus.  Title to the Macro Notes was transferred in the United States, as the trades were settled by United States brokers through the Depository Trust Company located in the United States.

26.    Plaintiff Discovery Global Opportunity Master Fund, Ltd. is a Cayman Islands fund whose investment manager has its main office location in South Norwalk, Connecticut. The dates on which Discovery Global Opportunity Master Fund, Ltd. purchased Petrobras Common ADS on the NYSE during the relevant period are attached hereto as Exhibit A.  The dates on which Discovery Global Opportunity Master Fund, Ltd. purchased Petrobras Preferred ADS on the NYSE during the relevant period are attached hereto as Exhibit B.  In addition to Petrobras ADS, Discovery Global Opportunity Master Fund, Ltd. purchased Petrobras Global Finance B.V. 6.250% Global Notes due 2024 unconditionally guaranteed by Petrobras (the "Opportunity Notes") in the United States on the date set forth on Exhibit C.  Discovery Global Opportunity Master Fund, Ltd. purchased the Opportunity Notes pursuant to a March 10, 2014 Prospectus Supplement to an August 29, 2012 Shelf Registration Statement and Prospectus. Title to the Opportunity Notes was transferred in the United States, as the trades were settled by United States brokers through the Depository Trust Company located in the United States.

**B.    Defendants**

27.    Defendant Petrobras is a Brazilian oil and gas company with a principal place of business in Rio de Janeiro, Brazil.  Petrobras maintains a New York office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.   Petrobras shares are listed on the São Paulo Stock Exchange under the ticker symbols "PETR 3" (common stock) and "PETR 4" (preferred stock).  American depository shares representing Petrobras common shares have been listed on the NYSE since 2000 trading under the ticker symbol "PBR."  Each Common ADS represents two ordinary Petrobras shares.   American depository shares representing Petrobras preferred

shares have been listed on the NYSE since 1996 under the ticker symbol "PBRA." Each Preferred ADS represents two Petrobras preferred shares. Petrobras made false and/or misleading statements as alleged herein.

28.     Defendant Petrobras Global Finance B.V. ("PGF") is a wholly-owned finance subsidiary of Petrobras that was incorporated under the laws of The Netherlands in 2012 as a private company with limited liability. PGF's registered office is at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands. PGF's business is to issue debt securities in the international capital markets, including in this District, to finance Petrobras' operations. PGF signed the August 2012 Shelf Registration Statement filed on Form F-3ASR with the SEC, pursuant to which billions of dollars of notes were sold into the U.S. capital markets, including to Plaintiffs.

29.     Defendant Maria das Graças Silva Foster ("Foster") was a member of Petrobras' executive board – the "Diretoria" – from September 2007 through February 2015. She first served as Petrobras' Chief Gas and Power Officer from 2007 until February 2012, and then served as Petrobras' Chief Executive Officer until her abrupt "resignation" earlier this year. Foster made false and/or misleading statements as alleged herein. She also signed the August 2012 Shelf Registration Statement filed on Form F-3ASR.

30.     Defendant Theodore Marshall Helms is Petrobras' Executive Manager of Investor Relations and the authorized representative of Petrobras in the United States. Helms signed the August 2012 Shelf Registration Statement filed on Form F-3ASR.

31.     Defendant Bank of China (Hong Kong) Limited ("Bank of China") acted as an underwriter and joint book runner of the March 10, 2014 debt offering pursuant to which PGF

and Petrobras sold the Notes (the "March 2014 Offering").  Bank of China maintains its principal place of business at 8/F, Bank of China Tower, 1 Garden Road, Hong Kong.

32.     Defendant BB Securities Ltd. ("BB Securities") acted as an underwriter and joint book runner of the March 2014 Offering.  BB Securities maintains its principal place of business at 4th Floor, Pinners Hall, 105-108 Old Broad Street, EC2N 1ER, London, United Kingdom.

33.     Defendant Banco Bradesco BBI S.A ("Bradesco BBI") acted as an underwriter and joint book runner of the March 2014 Offering.  Bradesco BBI maintains its principal place of business at Av. Paulista 1450, 8th Floor, São Paulo 01.310-917, Brazil.

34.     Defendant Banca IMI S.p.A. ("Banca IMI") acted as an underwriter and co-manager of the March 2014 Offering.  Banca IMI maintains its principal place of business at Largo Mattioli 3, 20121 Milan, Italy.

35.     Defendants Bank of China, BB Securities, Bradesco BBI, and Banca IMI are collectively referred to herein as the "Underwriter Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     Petrobras' History and Governance

36.     Petrobras is Brazil's largest corporation, and one of the world's richest oil companies.

37.     Brazil, which encompasses approximately half of South America and has the world's seventh-largest economy, is rich in natural resources, including petroleum.  The Brazilian federal government owns all crude oil and natural gas subsoil accumulations in Brazil.

38.     Petrobras was founded in 1953 to conduct the Brazilian government's oil and gas activities, including the construction and operation of oil refineries.  Although it is no longer the government's exclusive agent for exploiting Brazil's oil and gas due to deregulation that occurred in the 1990s, Petrobras still owns the vast majority of Brazil's oil and gas fields,

reserves, and infrastructure.  Indeed, Petrobras has been described as "the undisputed backbone of the [Brazilian] economy."

39.     In addition to its oil and gas activities in Brazil, Petrobras has an international presence in the oil and gas industry.  Petrobras conducts oil and gas exploration across the globe and has refineries in the United States, Japan, Angola and Nigeria.

40.     Petrobras is controlled by the Brazilian federal government, which owns a majority of Petrobras' voting stock and a large amount of its capital stock.

41.     Petrobras has a board of directors, or "Conselho de Administração," composed of between five and ten members.  The Brazilian government has the right to elect the majority of the members of the Conselho de Administração.  The Conselho de Administração is responsible for, among other things, establishing Petrobras' general business policies.

42.     The responsibility for Petrobras' day-to-day management is vested in its board of executive officers, or "Diretoria."  The Diretoria was initially composed of the Chief Executive Officer ("CEO") and the following six executive officers:

- Chief Financial Officer;

- Chief Services Officer;

- Chief Exploration and Production Officer;

- Chief Downstream/Supply Officer;

- Chief Gas and Power Officer; and

- Chief International Officer.

43.     In November 2014, Petrobras created a new position on the Diretoria: Executive Director of Governance, Risk and Compliance.

44.     According to the sworn testimony of Paulo Roberto Costa ("Costa"), a former Chief Downstream/Supply Officer of Petrobras, the seats on the Diretoria are controlled by various political parties.  Although technically elected by the Conselho de Administração, through their control of the government certain parties have the power to install their chosen representatives into certain seats on the Diretoria.  The CEO, CFO, Chief Services Officer, Chief Exploration and Production Officer, and Chief Gas and Power Officer positions are controlled by the ruling Partido dos Trabalhadores (the Workers' Party), or "PT."   The Chief Downstream/Supply Officer position is controlled by the Partido Progressista (the Progressive Party), or "PP."   The Chief International Officer position is controlled by the Partido do Movimento Democrático Brasileiro (the Democratic Movement Party), or "PMDB."

45.     Petrobras had two different CEOs during the relevant period, both appointed by the PT.  José Sérgio Gabrielli de Azevedo ("Gabrielli") was CEO from July 2005 through February 2012.  Defendant Foster replaced Gabrielli as CEO and served in that position until her resignation in February 2015.  From 2007 until the time she was elevated to CEO, Foster served on the Diretoria as Chief Gas and Power Officer.

46.     Almir Guilherme Barbassa ("Barbassa") served as Petrobras' CFO from 2005 until his abrupt resignation in February 2015.

47.     Costa was the Chief Downstream/Supply Officer between 2004 and 2012.  He was placed in that position by the PP.  As Chief Downstream/Supply Officer during the construction of several new refineries, Costa was in charge of billions of dollars of capital expenditures and projects.  Costa was replaced in 2012 by José Carlos Cosenza ("Cosenza"), who "resigned" in February 2015.

48.     Renator de Souza Duque ("Duque") was selected by the PT to serve as Chief Services Officer between 2003 and 2012.   One of Duque's right-hand men in the Services Division was Pedro José Barusco Filho ("Barusco").   Barusco reported directly to Duque as Executive Manager of Engineering.   As the top individuals in the Services Division, Duque and Barusco oversaw the procurement process for over 90% of Petrobras' contracts.   In May 2012, José Antônio de Figueiredo ("Figueiredo") became the Chief Services Officer (which position at that time was renamed "Chief Engineering, Technology and Procurement Officer").

49.     Nestor Cuñat Cerveró ("Cerveró") was selected by the PMDB to serve as Chief International Officer of Petrobras between 2003 and 2008.   In that role, Cerveró spearheaded Petrobras' acquisition and development of, among other things, a large refinery in Pasadena, Texas.  The PMDB replaced Cerveró with Jorge Luiz Zelada ("Zelada") in 2008, who served as Petrobras' Chief International Officer until 2012.

50.     Petrobras is organized into six business segments:

- o *Exploration and Production* ("Upstream").   This segment includes all oil and gas exploration, development and production in Brazil.

- o *Refining, Transportation and Marketing* ("Downstream"). This segment includes refining, logistics, transportation, trading operations, oil products and crude oil exports and imports, as well as the petrochemical sector in Brazil.

- o *Distribution* ("Midstream"). This segment oversees distribution of oil products, ethanol and vehicle natural gas to wholesalers and through Petrobras' "BR" retail network in Brazil.

- o *Gas and Power*.   This segment is in charge of transportation and trading of natural gas, as well as generation and trading of electric power and the fertilizer business.

- o *Biofuel*.   This segment includes production of biodiesel and its co-products and ethanol-related activities such as equity investments, production and trading of ethanol, sugar and the excess electric power generated from sugarcane bagasse.

      o  *International*.  Responsible for all exploration and production of oil and gas, refining, transportation and marketing, distribution and gas and power operations, outside of Brazil.

51.     In 2006, Petrobras discovered an important new source of oil reserves in the "pre-salt" rock under the Atlantic Ocean, 300 kilometers off the southeast coast of Brazil.  These pre-salt oil reserves were formed far below the seabed, under a layer of salt that was created over millions of years following the separation of the American and African continents.

52.     In 2010, the Brazilian authorities enacted new laws to regulate exploration and production activities in the pre-salt areas, giving Petrobras exclusive rights to the most significant pre-salt deposits.  Petrobras entered into an agreement with the Brazilian federal government on September 3, 2010, under which the government assigned to Petrobras the right to conduct activities in the pre-salt areas.  The initial purchase price for those rights was the equivalent of US$42.5 billion.

53.     In addition to its pre-salt activities, in the mid-2000s Petrobras began developing two new major refineries in Brazil:  the Abreu e Lima Refinery ("Abreu") and the Rio de Janeiro Petrochemical Complex ("Comperj").  These were the first new refineries to be built in Brazil since 1980.

54.     Petrobras requires enormous amounts of capital to exploit its oil and gas operations, having to invest billions of dollars in exploration, drilling, production, transportation, etc.  The exploration and development of the new pre-salt areas, along with its desire to aggressively exploit its existing reserves by building new refineries, resulted in Petrobras having to seek additional capital from outside investors.

**B.** **Petrobras Touts Its Integrity and Transparency to Gain Access to the U.S. Capital Markets**

55.     To fund its rapidly growing operations, Petrobras relied heavily on the U.S. capital markets.

56.     In 2007, Petrobras appointed Defendant Helms – the General Manager of Petrobras' New York office – to be Petrobras' Executive Manager of Investor Relations.  Helms "actively participated in Petrobras' efforts to access the international debt and equity capital markets, including working with the ratings agencies to obtain an investment grade rating for Petrobras."

57.     In 2010, Petrobras issued new shares in a global public offering consisting of a registered offering in Brazil and an international offering that included a registered offering on the New York Stock Exchange.  The Company raised approximately $70 billion in the global offering.

58.     Between 2012 and 2014, Petrobras raised an additional approximately US$29 billion through the sale of notes in the U.S., including the March 2014 Offering.  These offerings were underwritten by major Wall Street and foreign banks, including the Underwriter Defendants.

59.     Because Petrobras was regulated and controlled by the Brazilian federal government, U.S. investors required assurances that:  (a) the Company was following standard accounting procedures; (b) the Company had a system of strong internal controls relating to financial reporting and public disclosures; and (c) the Company had corporate policies in place to promote ethical business practices and prevent corruption.  Accordingly, Petrobras' certified disclosures in its filings with the SEC concerning the accuracy and transparency of its financial

statements and the effectiveness of its internal controls were critical to Petrobras' ability to raise funds in the U.S.

60.     To assure its investors of its compliance with U.S. securities laws, among other things, Petrobras' CEO and CFO repeatedly certified that Petrobras' annual reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," that its financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the Company," and that it had effective disclosure controls and procedures and internal controls over financial reporting.

61.     Petrobras also repeatedly touted its "Code of Ethics" to the investing public.  For example, in its 2012 annual report, the Company stated:

> We guide our business and our relations with third parties by ethical principles.  In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras subsidiaries, and which was renamed to Petrobras System Code of Ethics in 2002.
>
> In 2006, after undergoing a revision process with wide participation from our business segments, employees and subsidiaries, the current version of the Code of Ethics was approved by the board of executive officers and the board of directors.  The Code of Ethics is applicable to all employees, executive officers and the board of directors.  It is available on our website at http://www.petrobras.com.br/en/investors.
>
> Our executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission in 2008 which since then, has become responsible for promoting corporate compliance with ethical principles, as well as acting as a forum for discussion of subjects related to ethics.

62.     In 2009, Petrobras launched an official company internet blog called "*Facts and Data*."  The purpose of *Facts and Data*, according to Petrobras, was "to **give transparency to the processes of Petrobras**."[2]

63.     Indeed, Petrobras used *Facts and Data* to continually emphasize that it maintained a culture of ethics and transparency.  For example, in a December 29, 2012 post, Petrobras wrote:

> [A]ll the activities of Petrobras and its employees are fully oriented by principles of ethics and transparency.  ***The Petrobras system denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests***. . . .
>
> All Petrobras activities are accompanied by the Conselho de Administração composed of representatives of the Government and private shareholders.  Petrobras has its accounts analyzed in a permanent and continuous manner by internal and external auditors under the auspices of the Comptroller General of the Union (CGU) and the Court of Accounts of the Union (TCU).  The Company complies with the requirements of such agencies as the Securities Value Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbannes-Oxley [*sic*] law, having had all its balances audited and approved in all instances.  ***In 2012, for the 12th consecutive year, Petrobras was honored with the Transparency Trophy awarded by the National Association of Finance, Administration and Accounting Executives (ANEFAC), the Institute of Accounting, Actuaries and Financiers Research Foundation (FIPECAFI) and Serasa Experian***.

64.     In 2013, the Diretoria approved the "Petrobras Corruption Prevention Program," which purportedly was designed to "reassert Petrobras' **commitment to ethics and transparency**."

---

[2]     Unless otherwise noted, all bold and italic ***emphasis*** in quotations has been added throughout.

C.     **Petrobras Was Supposed to Follow Strict Standards Governing Its Procurement Procedures and Financial Reporting**

### 1. Procurement Procedures

65.     Due to the vast nature of its operations, Petrobras contracts with other companies to construct and develop property, plants, and equipment.

66.     Under Brazilian law, Petrobras and its representatives were (and are) required to engage in open and honest procurement procedures when engaging outside contractors.

67.     Article 37, Item XXI of the Brazilian constitution provides that:

> [P]ublic works, services, purchases and sales shall be contracted by means of public bidding proceedings that ensure equal conditions to all bidders, with clauses that establish payment obligations, maintaining the effective conditions of the bid, pursuant to the law, which shall only allow the requirements of technical and economic qualifications indispensable to guarantee the fulfillment of the obligations; . . . .

68.     To implement Article 37, Item XXI, Brazil enacted the Brazilian Bidding and Government Contracts Rule, Law 8,666/93.  That regulation provides that bidding for public contracts must be done in strict conformity with the basic principles of legality, morality, and equality.

69.     Presidential Decree 2,745/98 obligated Petrobras to comply with Law 8,666/93 through a "Simplified Bidding Procedure."  To guide its employees and suppliers during the relevant period in following the "Simplified Bidding Procedure Regulations," Petrobras issued the "Petrobras Procurement Manual."  According to Petrobras, its procurement process was "underpinned by legal, technical, quality and cost criteria, and formally oblige[d] suppliers to carry out their activities based on ethics and also social and environmental responsibility."

70.     As a further check on improper bidding, Petrobras purported to establish "segregation of functions among employees who demand goods or services, those who conduct

the procurement process, and those who are responsible for approving it.  [Petrobras] also established limits of authority, updated and approved periodically by the [Diretoria], for the signing of contracts."

71.     Oversight and implementation of the procurement procedure largely fell to the Services Division of Petrobras, which supported the business divisions of Petrobras, including the Downstream Division, the Exploration and Production Division, the Gas and Power Division, and the International Division.  The Services Division conducted the bidding process for projects commissioned by the business divisions.

72.     As Brazil's largest company with billions of dollars invested in development projects, Petrobras' expenditures were often questioned by the Brazilian media and the political opponents of the ruling government coalition.  Whenever Petrobras' procurement practices were questioned, the Company emphatically denied that it was deviating from proper procedures.

73.     For example, in 2009, a Brazilian senate committee commenced an investigation of whether Petrobras had evaded the equivalent of US$2.6 billion of taxes, had overpaid for goods, and had favored supporters of then-President Luiz Inacio Lula da Silva when it made charitable donations.  The probe was called for by a Brazilian senator politically opposed to the ruling coalition, and therefore the investigation was characterized in the Brazilian press as politically motivated.  Current President Dilma Rousseff, who at that time was the Chairwoman of Petrobras, stated in response to the investigation:   "***Petrobras has one of the most accurate accounting standards in the world***. . . .  If it wasn't the case, investors would not be seeking out the company as one of the great investment targets."

74.     Petrobras also denied that there was anything improper in the procurement of contracts related to the Abreu refinery.  Abreu was a massive new refinery that Petrobras began

constructing in the mid-2000s.  Abreu was initially budgeted at a total cost of US$2.5 billion in 2005, but that cost rose dramatically to US$13.3 billion by 2009.  By the time Abreu began operations in November 2014, it had cost Petrobras US$18.5 billion.

75.    In a January 29, 2010 posting on *Facts and Data*, Petrobras "reaffirm[ed] that there ha[d] been no 'overbilling' or 'overpricing' in the Abreu e Lima Refinery works."

76.    In a November 9, 2010 posting on *Facts and Data*, in response to a newspaper article alleging that the Brazilian accounting administration overseeing Petrobras – the TCU – had discovered overpricing in Abreu contracts, Petrobras denied "that there ha[d] been irregularities in the works of" Abreu.  Petrobras further emphasized:

> In the preparation of its call to bids, ***Petrobras rigorously observes the terms of Decree No. 2,745/98***, which deals with Simplified Bidding Procedure and which endows the Company with the agility to develop its projects with efficiency, economy and profitability.
>
> Petrobras reiterates that the criteria of acceptability of prices questioned by [TCU] are aligned with national and international technical standards in regard to the subject.  In addition, in the formation of prices, the Company also considers aspects related to safety items, the environment, health and social responsibility. These requirements produce important results, such as low on-the-job accident index.

77.    In a November 8, 2011 *Facts and Data* post concerning Abreu, Petrobras emphatically stated that "***there has not been any overbilling, overpricing or any other irregularities in its works***."

78.    In a January 7, 2013 posting on *Facts and Data*, Petrobras "reiterate[d] that there are no irregularities in the construction of the Abreu e Lima Refinery in Penambuco."

79.    Petrobras also denied any impropriety in the contracts relating to the new Comperj refinery.  When it was conceived in 2006, Comperj was expected to cost US$6.1

billion.   By the time Petrobras prematurely halted construction on Comperj in 2015 due to concerns about rising costs, that price had ballooned to US$47.7 billion.

80.     As the media began to question the increasing cost of Comperj, Petrobras repeatedly asserted that the price was justified.   In an October 8, 2010 posting on *Facts and Data*, Petrobras "reaffirm[ed]" that "there are no irregularities in the contracts of the Rio de Janeiro Petrochemical Complex (Comperj). . . .   ***There is no overbilling***."   Petrobras made an almost identical statement in *Facts and Data* on January 7, 2013.

81.     Petrobras' denial of improprieties in its procurement process at refineries was not limited to its Brazilian operations.   In 2006, Petrobras signed a joint venture agreement with Transcor Astra Group SA ("Astra") to purchase half of a refinery in the Pasadena Refining System ("Pasadena") in Texas.   Petrobras paid Astra US$360 million for its 50% interest in Pasadena, even though Astra had purchased the entire refinery for only US$42.5 million just a year earlier.   When Astra exercised its put option to sell the remaining 50% to Petrobras, a dispute arose between the parties about the amount owed to Astra.   Petrobras ultimately settled with Astra and paid an additional US$821 million to Astra for Pasadena.   Thus, the total cost that Petrobras paid to acquire Pasadena was almost US$1.2 billion, more than 25 times the purchase price paid by Astra.

82.     Petrobras adamantly denied that it had overpaid for Pasadena.   On August 6, 2013, former CEO Gabrielli appeared before a Brazilian congressional committee to answer questions about Pasadena.   According to *Facts and Data*, Gabrielli told the committee members that statements in the press alleging overbilling and irregularities at Pasadena were a result of "ignorance of the petroleum and derivatives market."

83.    In a May 23, 2014 *Facts and Data* posting, Petrobras again sought to justify the price paid for Pasadena, and denied any corruption in the purchase process, stating:

> ***Payments of any sort made and in any country follow rigid, clear internal procedures and pertinent legislation***.  In addition, we have a well-structured Internal Auditing area that has access to any unit in the Petrobras System to verify the conformity of procedures and operations carried out.

84.    Petrobras' emphatic denials of any improprieties in its procurement procedures were not limited to its refinery projects.  In 2010, Petrobras entered into an agreement with SBM Offshore N.V. ("SBM") for the construction of a Floating Production, Storage and Offloading ("FPSO") for its pre-salt operations.  A FPSO is a floating vessel used for the production, processing and storage of oil produced as a result of deep-water drilling.

85.    Following media reports in early 2014 that SBM had paid bribes to Petrobras executives, Petrobras established an "Internal Verification Commission" to purportedly investigate the claims.  *Facts and Data* subsequently reported that "the Internal Verification Commission . . . did not find facts or documents indicating the payment of bribes to Petrobras employees.  It is also appropriate to point out that the investigation conducted by SBM Offshore found no evidence of improper payments."

### (2)    *Financial Reporting*

86.    As a foreign issuer that lists its securities on the NYSE, Petrobras is required to file certain disclosure documents containing comprehensive information about its business operations and its financial condition.  Investors rely on the accuracy and transparency of these disclosures when determining whether to invest in a foreign company.  Under SEC regulations, a foreign issuer may prepare its financial statements using United States Generally Accepted Accounting Principles ("U.S. GAAP"), or it may use another comprehensive body of generally accepted accounting principles.  If a foreign issuer elects to use the latter, it must provide a

reconciliation of material terms to U.S. GAAP.  Since 2011, Petrobras has used the International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB") to report its financial results to U.S. investors.  Prior to 2011, Petrobras reported its financial results using U.S. GAAP.

87.     Under the IFRS (as well as under U.S. GAAP), Petrobras' wells, platforms, refining facilities, pipelines, vessels, other transportation assets, and power plants are capitalized as assets on its financial statements under "Property, Plant & Equipment," or "PP&E," and are depreciated over time.

88.     International Accounting Standard ("IAS") 16 provides that "[t]he cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably.  Furthermore, "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."  Cost is defined by IAS 16 as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction . . . ."  The cost of an item of PP&E is comprised of its purchase price, plus "any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management," plus the estimate of "dismantling and removing the item and restoring the site on which it is located."  Similarly ASC 360 provides that PP&E should be initially measured at cost. The "historical cost" of PP&E "includes the costs necessarily incurred to bring it to the condition and location necessary for its intended use."

89. Petrobras expressly acknowledged the applicability of this accounting principle to its financial statements in its annual reports. For example, in its 2012 annual report, Petrobras stated:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

90. Thus, under both domestic and international generally accepted accounting principles, Petrobras is only permitted to capitalize the amount it paid in connection with the acquisition or construction of its wells, platforms, refining facilities, pipelines, vessels, power plants, etc., plus any costs necessary to bring those assets to working condition for their intended use. Improper payments made in excess of that amount must be recorded by Petrobras as *expenses* rather than capitalized as part of the asset. When such payments are recorded as current expenses – as opposed to being capitalized as assets – they have the effect of reducing Petrobras' net income.

91. After an item of PP&E has been recognized as an asset, it is carried on Petrobras' balance sheet at its cost "less any accumulated depreciation and any accumulated impairment losses." This is referred to as the "carrying amount" of the asset. The carrying amount of the asset is reduced over time as depreciation is recognized.

92. Petrobras is required to test its PP&E for impairment; that is, Petrobras must compare the carrying amount of a particular item of PP&E to its recoverable amount. If the recoverable amount of the asset is less than the carrying amount, an impairment loss/operating expense is recognized to reduce the carrying amount to the recoverable amount.

93.     During the relevant period, PP&E accounted for a significant majority of Petrobras' total assets.  Thus, Petrobras' accurate reporting of the value of its PP&E on its balance sheet was highly material to investors and the securities markets.

94.     As further detailed below, throughout the relevant period Petrobras consistently represented that its financial statements were in compliance with the basic accounting principles described above.

### C.     The Massive Kickback and Bribery Scheme at Petrobras

95.     Unbeknownst to the market, for many years top-ranking executives at Petrobras were engaging in a massive kickback and bribery scheme, lining their own pockets with money paid by a cartel of contractors who conspired with the executives to inflate the price of Petrobras' most significant contracts.

96.     The details of this scheme were only recently revealed through the testimony of several high-ranking individuals who have agreed to cooperate with Brazilian federal prosecutors in return for more lenient sentences.  The reliability of this testimony is reinforced by the fact that the informants must back up their statements with documentary evidence and are subject to lawsuits if the information they provide to police is later deemed to be inaccurate.

97.     According to sworn testimony provided in Brazilian criminal proceedings, the kickback and bribery scheme has been in place for many years.  However, the scheme intensified significantly when Petrobras' ramped up its operations in the mid-2000s, launching numerous new projects that required Petrobras to contract with outside companies to provide construction and engineering services.

98.     Under Brazilian law, Petrobras was required to use Brazilian companies to perform certain of these services.  However, because of the size and complexity of Petrobras' oil

and gas projects, there were only a few Brazilian engineering and construction companies that were capable of properly performing these services.

99.     With the help of Petrobras' most senior executives, these companies conspired together to form a cartel to overcharge Petrobras for their services by manipulating the procurement process.

100.     The kickback and bribery scheme that arose from this "cartelization" involved three main steps. *First*, the members of the cartel determined which member company would submit the winning bid for an upcoming Petrobras contract. *Second*, the cartel members involved in the bidding process all agreed to submit bids far in excess of Petrobras' acceptable budget, so that Petrobras was forced to negotiate with the lowest bidder (who had been pre-selected by the cartel) to get that cartel member to agree to a contract price at the very top of Petrobras' budget. This resulted in Petrobras consistently overpaying billions of dollars for services that would have cost considerably less if there had been an honest, competitive bidding process. *Third*, the member of the cartel selected by Petrobras to perform the work would kickback a bribe of 3% of the contract price to certain members of the Petrobras Diretoria and their political godfathers who had placed those executives on the Diretoria. To prevent detection, these Petrobras executives and the ruling politicians quickly squashed any dissent from lower-level Petrobras employees who raised concerns about the impropriety of the procurement process.

101.     The members of the cartel met regularly in Sao Paulo or Rio de Janeiro. During these meetings, the cartel discussed upcoming procurement invitations from Petrobras and decided which member company would get the job. The members rotated so that they received

an equal share of the opportunities.  The members of the cartel referred to themselves as a "VIP club."

102.    According to the sworn testimony of Costa and Barusco, the following companies were members of the cartel:  Odebrecht, Camargo Correa, OAS, UTC, Queiroz Galvao, Toyo Setal, Techint, Galvao Engenharia, Andrade Gutierrez, Iesa, Engevix, Mendes Junior, MPE, Skanska, GDK and Promon.

103.    Costa testified that the chairmen of these companies approached him after he was appointed to the Diretoria to inform him about the cartel.  Barusco testified that he was also approached by executives of cartel members with lists of companies who should be invited to bid for a particular project.

104.    When Petrobras wished to procure bids for a project, the Services Division was responsible for preparing the basic budget for that project.  Under Petrobras policy, the winning bid had to be within a specified range of the basic budget.  Typically, the bid had to be no more than 20% above and no more than 15% below the basic budget.

105.    The Services Division – under the control of Duque and Barusco – would then solicit bids from the members of the cartel.

106.    The members of the cartel agreed that they would submit bids high above the maximum amount acceptable to Petrobras, although the preselected "winner" would present the lowest of those bids.  When no company made a bid within Petrobras' acceptable range, Petrobras would scrap the bids and engage in a negotiation with the lowest bidder (who had been preselected by the cartel) to see if that bidder could get within Petrobras' acceptable range (i.e., under 120% of the basic budget).

107.    According to Costa, this process resulted in the final price that Petrobras paid for contracts always being "stretche[d] to the limit."

108.    Indeed, Barusco stated in one of his sworn collaboration statements that the cartel exerted "'organized pressure' to close the contract values at prices at the very top limit of the Petrobras budget."

109.    Alberto Youssef ("Youssef"), a professional money launderer who aided the PP in distributing the cash from the kickback scheme, corroborated this in his testimony before a Brazilian court:

> **Federal Prosecutor:**   So, we can conclude that, due to the existence of the cartel, the contracts executed by Petrobras were always executed at the maximum amount possible or close to it?
>
> **Youssef:** Or close to it.

110.    Thus, the payments that the cartel members received from Petrobras were inflated to the greatest extent that Petrobras' executives could permit, rather than at a competitive price that would have been obtained through a bona fide bidding process.

111.    Once the inflated contract price was agreed upon, the contract was submitted to the Petrobras Diretoria for approval.

112.    In order to keep the leaders of the governing political parties and their representatives on the Diretoria happy, the members of the cartel were required to kickback a bribe of approximately 3% of the contract price.  If any member of the cartel did not pay the 3% bribe, that company would be excluded from bidding on future contracts.

113.    According to Costa, at the very least, the Chief Services Officer, the Chief Downstream/Supply Officer, and the Chief International Officer on the Diretoria were all aware of the cartel and received payments from the illegal kickback scheme.  According to Youssef, the scheme was also well known to the President of Petrobras (i.e, the CEO) and to the office of the

President of Brazil, whose political party (the PT) received massive amounts of money from the kickback scheme.

114.    When the bribe paid by the cartel related to a project that fell within the area covered by of one of the PT's appointees on the Diretoria, the full 3% bribe was routed to the Treasurer of the PT, José Vaccari.

115.    When the bribe related to a project that fell within the area covered by the Chief Downstream/Supply Officer, who was the PP's representative on the Diretoria, 2% was routed to the PT, and the remaining 1% went to the PP.  Of that remaining 1%, 60% went to the PP, 20% went to cover the operational costs of the kickback scheme, and the remaining 20% went to Costa and sometimes to Youssef.

116.    In order to cover up the illegal kickbacks, the members of the cartel paid the 3% bribe into offshore bank accounts set up by middlemen, such as Youssef, hired by Petrobras executives and their political godfathers.  Once the money was transferred into the offshore accounts, the hired money launderers brought the cash back into Brazil for payment to the PT, the PP, Duque, Costa, and Barusco, among others.

117.    The illegal activities of the cartel permeated all aspects of Petrobras' business. According to Costa, "every contract in every area . . . was subject to actions by the cartel and payment of bribery."

118.    The bribes received by Petrobras executives were not related solely to cartel projects.  Corruption became so pervasive at Petrobras that companies who were not members of the cartel, both domestically and internationally, were required to make payments to Petrobras executives and their political godfathers.

119.    Two of the projects from which Petrobras executives took some of the biggest kickbacks were the Abreu and Comperj refineries, projects that ultimately cost Petrobras billions and billions of dollars.

120.    According to Barusco's collaboration statement to Brazilian prosecutors:

> [W]ith respect to the cartel, the intervention was along the lines of having management selection in favor of specific enterprises and, in addition to managing the choice, imposing excessive prices, as was most obvious in [Abreu]; . . . in the period that [Barusco] held the position of Executive Manager of Engineering in Petrobras, he clearly perceived the cartel intervention, quite strongly, in the contracting of [Abreu], in which the cartel, in addition to directing the contracts, wanted to impose prices "very much above the budget" of Petrobras . . . ; . . . in the case of [Abreu] there was clear overbilling . . . ."

121.    Costa provided a specific example to authorities of an Abreu project where the budget established by Petrobras was around US$1.4 billion, but the cartel bid was around US$2.1 billion.  The process described above resulted in the final amount Petrobras paid for this Abreu project being "much higher than the real values."

122.    The cartel also exerted its control over, and paid significant bribes in connection with, the construction of the Comperj refinery.  Barusco testified that the cartel intervened in Comperj in the same manner that they had done at Abreu, "offer[ing] prices excessively over the internal budget."  Indeed, Barusco provided numerous examples of bid-rigging and bribery in connection with Comperj.

123.    Thus, despite Petrobras' repeated recitations in response to questions about ever-increasing costs that there were no "irregularities" or "overpricing" at Abreu and Comperj, Petrobras paid vastly inflated prices for those projects and Petrobras senior executives and their political godfathers received kickbacks as a result of the improper price inflation.

124.    The bribery scheme also reached Petrobras' International Division, which was headed by Cerveró between 2003 and 2008.

125.    In his testimony before the Brazilian court, Costa confirmed that, like Duque and himself, Cerveró received bribes from the cartel.

126.    Indeed, the kickback scheme heavily impacted the Pasadena refinery project, the purchase and oversight of which was managed by the International Division.

127.    According to *The Rio Times*, Costa told Brazilian authorities that he personally received a bribe of US$1.5 million in connection with the purchase of Pasadena.  Costa believes the bribe was paid by Astra Oil, through an intermediary, to make sure Costa did not interfere in negotiations over Petrobras' purchase of Pasadena.

128.    Cerveró, who was Chief International Officer at the time of the Pasadena purchase, is reported to have received US$20-30 million in bribes in connection with the Pasadena transaction.

129.    On or about November 16, 2015, Brazilian prosecutors announced that Astra alone paid US$15 million in bribes in connection with its sale of Pasadena to Petrobras.

130.    Petrobras executives also received bribes from SBM.  In November 2014, SBM agreed to pay US$240 million to The Netherlands's prosecution office in a settlement of a case that included allegations of improper payments to Petrobras.

131.    According to *Bloomberg*, court documents confirm that Barusco received illicit cash from SBM.  Barusco received at least US$22 million in bribes paid by SBM.

132.    In April 2012, Costa was forced out of his position at Petrobras due to a political dispute.  After at least seven years of participating in the kickback scheme, Costa had personally received tens of millions of dollars in bribes.  At the time of his departure, according to press

reports, CEO Foster referred to Costa as a "dear colleague" who would be "hard to replace," even though, as further explained below, Foster was aware of Costa's role in the massive kickback and bribery scheme.

133.    When he left Petrobras, there were several payments still owing to Costa by the cartel on contracts he had helped them procure at inflated prices.  Accordingly, Costa set up a consulting business and entered into consulting agreements with at least two members of the cartel so that they could continue to make payments to him.

134.    Barusco also received at least tens of millions of dollars in illegal bribes. Furthermore, when Barusco left Petrobras in 2010, he was made a director of a Sete Brasil, an oilrig provider that had been awarded more than $25 billion in contracts from Petrobras.  After his arrest in November 2014, Barusco agreed to return US$100 million to the authorities, a record amount paid by a single person.

### D.    Petrobras Executives Silence Potential Whistleblowers

135.    As the scope and size of the kickback scheme at Petrobras grew, certain Petrobras employees not involved in the scheme attempted to raise concerns about the procurement process with senior management, including Petrobras' highest-ranking officials.  Rather than put a stop to the illegality, however, these executives sought to silence the potential whistleblowers by marginalizing, threatening, and transferring them to different positions within the company.

136.    According to hundreds of internal Petrobras documents reviewed by the Brazilian business publication *Valor*, one of these concerned employees was Vinina Velosa da Fonseca ("Fonseca").  In 2008, Fonseca was working as a manager in the Downstream Division under Costa.  Fonseca noticed that certain contracts exceeded the budgeted value of services by a significant amount, but were structured in such a way that the overpayments were difficult to

trace.  Fonseca raised the issue with Costa, who reacted angrily and, pointing to a portrait of the then-President of Brazil hanging on his office wall, asked Fonseca if she wanted to "bring down everybody."

137.    Undeterred by Costa's reaction, Fonseca elevated the issue to Petrobras' then-CEO, Gabrielli.  Gabrielli agreed to set up a committee chaired by a fellow member of the PT to look into the issue.  Although the committee found that the Company had paid tens of millions of dollars for communications services that were never performed and had paid multiple invoices for the same job, the only action taken by the committee was to place the communications director on sick leave, where he remained for five years.

138.    Fonseca also raised the issue with Foster, who was at that time Chief Gas and Power Officer.  According to the *New York Times*, in 2008 Fonseca met in person with Foster and told her about overpayments by Petrobras to cartel members and payments that Petrobras had made for services that it never received.  Fonseca later told a Brazilian TV program, *Globo TV*:  "I met with the CEO personally when she was director of the gas and energy unit.  At that time, we discussed the matter.  I handed over to her the documents about the complaints."  Fonseca continued: "Afterward, she had access to these anomalies at the management meetings."

139.    According to *Valor*, on April 3, 2009, Fonseca sent an email to Foster, again apprising Foster of the problems in the communications department of the Downstream Division and also informing her of a significant increase in amounts being paid in connection with the Abreu refinery.

140.    In a May 2009 letter, Fonseca criticized the procurement model governing Abreu and noted that it disproportionately benefited the member companies of the cartel.

141.     In all, Fonseca made 107 "Project Change Requests" for the Abreu refinery procurement process, which were designed to stop the overpayments.     However, her recommendations were completely ignored by senior management.

142.     Not only were Fonseca's recommendations to end the corruption at Petrobras brazenly brushed aside by senior management, but her life was even threatened because of her efforts.  At one point, Fonseca was threatened by an assailant with a gun, who told her that she should keep quiet.

143.     Ultimately, frustrated that her complaints were continuously falling on deaf ears, Fonseca resigned from her post in the Downstream Division in October 2009.  Thereafter, Petrobras executives transferred Fonseca to work in Singapore.

144.     On October 7, 2011, Fonseca again wrote to Foster.  Fonseca told Foster:  "From the immense pride that I had for my company, I started to feel ashamed."  She continued, "Directors start acting as gods and treating people like animals.  What happened in the Abast [the Downstream Division] in the area of communications and works was an absolute nonsense."

145.     When she received the 2011 email from Fonseca, Foster was already aware of the significant improprieties in Petrobras' procurement process.  Indeed, in the email, Fonseca suggested submitting supporting documentation to Foster, commenting:  "Some of it I know you already know.  I would like to hear you before I take the next step."

146.     On November 19, 2014, following Fonseca's persistent complaints about the irregularities at Petrobras, Fonseca was fired.  According to *Valor*, "[a]fter making hundreds of warnings and recommendations on money misappropriations in the company, [Fonseca] was ousted by the current management without being informed [of] the reason . . . ."

147.     The next day, Fonseca wrote to Foster one last time:

> Since 2008 my life has become a hell.  I came across an initial
> scheme of embezzlement within the [Downstream Division].  By
> fighting it, I was threatened and harassed.  I even had a gun
> pointed to my head and received threats against my daughters.

148.    Fonseca concluded:

> I have with me all the documentation of the case, which I never
> offered to the press out of respect for Petrobras, despite all the
> journalists' attempts of contacting.  I presented the matter to the
> company's competent authorities, including the Legal and Audit
> [departments], which was in vain.

149.    On December 19, 2014, Fonseca testified for five hours – under police protection – before Brazilian prosecutors concerning the irregularities in Petrobras' procurement process that she complained about for five years to Petrobras' most senior executives, including its CEO.

150.    Fonseca was not the only Petrobras employee who complained to senior management of irregularities in the Company's procurement process.  Fernando de Castro Sá was a lawyer in the Downstream Division who interacted regularly with Chief Services Officer Duque.  In 2008 and 2009, Sá began noticing irregularities in Petrobras' contracts with members of the cartel concerning Abreu.

151.    When Sá raised these irregularities with his superiors, CEO Gabrielli and Duque quickly marginalized Sá.  He was transferred to a small room with no windows and no computer.  In his testimony to Brazilian prosecutors, Sá stated that it was his understanding that Gabrielli and Duque wanted him to resign as a result of his questioning of the procurement process.

### D.    Operation "Lava Jato" and Petrobras' Denials of Wrongdoing

152.    The massive kickback and bribery at Petrobras was ultimately exposed not because of any corporate whistleblower or Petrobras internal control, but because of a fortuitous twist in a police investigation that initially had absolutely nothing to do with Petrobras.

153.   In 2012, Brazilian federal police were conducting a money laundering investigation unrelated to Petrobras.   As part of that investigation, the police conducted surveillance of the Tower Gas Station in Brasília.   Authorities codenamed the investigation Operation "Lava Jato" (Operation "Car Wash") because the Tower Gas Station had at one time housed a car wash.

154.   During their surveillance and wiretapping of the Tower Gas Station, one police officer recognized the voice of Youssef.   Youssef was a known money launderer who had previously served time in prison.   The police tapped Youssef's cell phone and email communications.

155.   One Youssef email that the police reviewed detailed his purchase of an extremely expensive Range Rover, which Youssef then gave to Costa.   It would later be revealed that this luxury car was given to Costa as part of the kickbacks he was "owed" from the cartel after he left Petrobras.

156.   Given the suspicious gift of a luxury car from a known money launderer, the Brazilian police obtained a search and arrest warrant for Costa, who was up until that point a well-respected former member of the Diretoria of Brazil's most important company.   Indeed, Costa had once been described as the face of Petrobras, who was popular with the press and investors during a time of prosperity for the Company.

157.   On March 20, 2014, Brazilian police raided Costa's home and office.   Security footage from the day of his arrest reportedly shows Costa and his family stuffing cash, documents and a laptop into suitcases and bags.

158.   During the raid of Costa's home, police found approximately US$500,000 in cash that Costa had received from the kickback scheme.

159. Costa was also discovered to have US$28.5 million stashed in Swiss bank accounts, which was money he received as kickbacks.

160. Costa was arrested and jailed by Brazilian police.

161. Costa's arrest turned Operation Lava Jato from a money laundering investigation unrelated to Petrobras into a massive prosecution that would ultimately send shockwaves throughout Brazil.

162. Notwithstanding the fact that their former Chief Downstream/Supply Officer had been arrested and the fact that Petrobras' most senior executives knew of a much broader bribery and kickback scheme, Petrobras officials persisted in denying any "irregularities" at Petrobras.

163. In April 2014, Foster told reporters at the inauguration of a new oil tanker in Pernambuco, Brazil, that despite the allegations against Costa she "believed one thousand times" in Petrobras' fundamentals.

164. On April 15, 2014, Foster appeared before a senate committee and denied any irregularities in connection with the purchase of the Pasadena refinery, stating that the purchase had not been a good deal for Petrobras only because of "incomplete documentation" provided to the Diretoria at the time of the purchase.

165. On May 12, 2014, Petrobras held an earnings call with analysts and investors to address its first quarter results and other company developments.  During the call, Foster resoundingly stated that:  "***there are no facts or documents that would document the payment of bribery to any employees of Petrobras***."

166. On May 23, 2014, Petrobras issued a posting on *Facts and Data* with the title "***We have rigid legal procedures for payments*** including in the purchase of Pasadena."  In the statement, Petrobras sought to dispel any rumors of improprieties in its business operations

following the arrest of Costa by highlighting its purported internal controls and the oversight of the Company by regulators:

> ***Payments of any sort made and in any country follow rigid, clear internal procedures and pertinent legislation***.  In addition, we have a well-structured Internal Auditing area that has access to any unit in the Petrobras System to verify the conformity of procedures and operations carried out.
>
> ***In addition to our internal processes, we have our accounts and balances audited by external auditors and, being a company with shares on the stock market, we are subordinate to market regulator organs, the Securities and Exchange Commission of Brazil (CVM) and the U.S. (SEC), and all the rules of information governance and dissemination relevant to the market.  Our contracts are overseen by such control agencies and the Court of Accounts of the Union (TCU) and the Comptroller of the Union (CGU)***.
>
> In regards to the Pasadena refinery, the final values of the purchase arise not just from negotiations between the parties but also from arbitration and judicial procedures.

167.    Petrobras issued another statement to try and downplay the arrest of Costa on July 12, 2014, this time addressing the payments made for Pasadena and to SBM.  In that statement, Petrobras denied any excess payments or the receipt of bribes.

168.    Two days later, Petrobras issued another release denying any improprieties at Abreu.  Specifically, Petrobras affirmatively represented to investors that there were "***no indications of irregularities***" and that "***there has been no overpricing or overbilling in the works of the Abreu e Lima Refinery***."

169.    Following his arrest and imprisonment, Costa adamantly denied the allegations against him and emphatically stated that that there was no kickback or bribery scheme at Petrobras.

170.    On August 22, 2014, however, Costa flipped, signing a plea bargain with prosecutors and agreeing to cooperate in exchange for a lighter sentence and to spare his family

from prosecution. In addition to providing testimony, Costa agreed to turn over the money in his Swiss bank accounts, a US$440,000 yacht, US$1.3 million of land, and the Range Rover he received from Youssef.

171. After Costa provided testimony to the authorities implicating them in the kickback and bribery scheme, Youssef and Barusco also entered into plea deals with Brazilian prosecutors. They provided prosecutors with additional testimony and documents concerning the kickback and bribery scheme in return for more lenient sentences.

172. As more individuals implicated by the scheme began to step forward in order to avoid serious jail time, Brazilian authorities focused in on the cartel. Two executives of cartel member Toyo Setal – Julio Camargo ("Camargo") and Augusto Mendonca ("Mendonca") – agreed to cooperate with authorities after they were arrested. According to *Bloomberg*, Camargo and Mendonca disclosed at least nine major Petrobras contracts received by Toyo Setal for which they paid kickbacks to Duque and Barusco. Some of these contracts were worth more than US$10 billion.

173. Operation Lava Jato, which grew from an unrelated money laundering investigation into a full blown inquisition of the highest levels of Brazil's most important company, has yielded extensive testimony and documentary evidence about the massive kickback and bribery scheme at Petrobras.

### E. The Truth Gradually Emerges, Causing the Price of Petrobras ADS to Decline Precipitously

174. Although the full extent of bribery and accounting fraud at Petrobras has likely not yet been revealed, a series of partial corrective disclosures between August 12, 2014 and February 6, 2015, caused the price of Petrobras Common ADS and Preferred ADS to materially decline, leading to significant losses to investors such as Plaintiffs.

175.     On August 12, 2014, after the close of trading, *Bloomberg* released an article disclosing that prosecutors had expanded their allegations concerning money laundering at Petrobras to several well-known banks, thus lending more credence to prosecutor's allegations against Petrobras.  In response to this news, the price of Petrobras stock fell.  The Common ADS fell $0.72/share, from a price of $16.18/share at the close of trading on August 12, 2014, to a price of $15.46/share at the close of trading on August 13, 2014.

176.     On August 22, 2014, *Bloomberg* reported that Brazilian prosecutors were expanding their "money-laundering probe linked to [Petrobras] as a court considers freezing Chief Executive Officer Maria das Gracas Foster's assets."  On this news, the Common ADS fell $0.53/share, from a price of $17.73/share at the close of trading on August 21, 2014, to a price of $17.20/share at the close of trading on August 22, 2014.

177.     During the weekend of September 6 and 7, 2014, the Brazilian magazine *Veja* leaked that Costa had entered into a plea bargain with Brazilian prosecutors.  *Veja* also released the names of the politicians named by Costa as being involved in the scandal.  Upon the release of this news, which revealed to the market that Costa was no longer denying the allegations against him but was now admitting his participation in some sort of kickback scheme, the price of Petrobras common and preferred stock dropped by more than 5%.  Specifically, the Common ADS fell $1.03/share, from a price of $19.38/share at the close of trading on September 5, 2014, to a price of $18.35/share at the close of trading on September 8, 2014.

178.     In response to this news, President Roussef essentially dismissed the revelations as frivolous:  "I assure you I will take the necessary action.  But I will not act based on speculation, I want the details."

179.    On September 8, 2014, after the markets closed, Petrobras issued a "Clarification on News" press release.  In its statement, Petrobras tried to distance itself from the reports of Costa's testimony:  "[M]edia outlets have been publishing materials containing Petrobras' name based on non-official information obtained from Mr. Paulo Roberto Costa's alleged testimony to the Federal Police."  However, in contrast to its prior *Facts and Data* posts, Petrobras did not expressly deny the existence of any "irregularities" in its procurement process.  On this news, the price of Petrobras ADS again decreased.  On September 9, 2014, Common ADS closed at $17.83/share.

180.    On Saturday, September 27, 2014, *Bloomberg* reported that, according to *Veja* magazine, Costa had told police that President Roussef's presidential campaign had approached him in 2010 and asked for the equivalent of US$1.1 million, thus suggesting that officials at the highest levels of government were involved in the kickback and bribery scheme.  The next trading day, the price of Petrobras ADS declined.  The Common ADS closed on September 26, 2014, at $16.46/share, and closed on September 29, 2014 at $14.70/share.   The Preferred ADS closed on September 26, 2014, at $17.35/share, and closed on September 29, 2014 at $15.37/share.

181.    On September 30, 2014, after the market closed, *Bloomberg* released an article detailing the involvement of a second member of the Diretoria – Chief Services Officer Duque – in the kickback scheme.  According to the article:

> [Petrobras] contracts at the center of a criminal investigation that has former executive Paulo Roberto Costa awaiting trial show that another top manager had negotiated and recommended board approval of the allegedly over-billed deals.
>
> Renato Duque, a former director of engineering and services at the state-run crude producer, stamped and signed at least [US$2.7 billion] in contracts for the Abreu e Lima refinery in northeastern

Brazil, according to internal Petrobras documents obtained by Bloomberg.

182.     Thus, the market was informed that the scope of the kickback and bribery scheme was larger than previously disclosed, and was not limited to a lone wolf, although the market was not yet apprised of the full impact of the scheme.  On this news, the price of Petrobras equities dropped again.  The Common ADS closed on September 30, 2014, at $14.19/share, and fell the following day to $13.30/share.     The Preferred ADS closed on September 29, 2014, at $14.89/share, and closed the following day at $13.84/share.

183.     On October 9, 2014, the *Wall Street Journal* released details of Costa's testimony to Brazilian authorities after obtaining copies of the audio recordings of that testimony.  According to the *Wall Street Journal*, Costa "testified in a Brazilian federal court that kickbacks were paid to members of the ruling [PT]."  However, the national president of the PT released a statement that the PT "'vehemently repudiates' the 'slanderous' allegations, and that all donations to the PT follow legal standards.  On this news, Petrobras' stock price dropped significantly in price.  The Common ADS closed on October 9, 2014, at $16.77/share, and dropped to $15.62/share at close on October 10, 2014.   The Preferred ADS closed on October 9, 2014, at $17.77/share, and dropped to $16.55/share at close on October 10, 2014.

184.     Petrobras continued to deny allegations of wrongdoing, and attempted to convince the public that the kickback scheme was the work of just a few bad apples.  For example, on the morning of October 14, 2014, according to *Bloomberg*, Petrobras stated that authorities viewed the company as the victim of the scheme.

185.     On the morning of October 15, 2014, *Bloomberg* directed investors to an article in *Valor Econômico* disclosing that the Administrative Council for Economic Defense ("CADE"), an agency of the government of Brazil which was set up to combat corruption, announced that it

will formally investigate the existence of a cartel involving enterprises that have contracts with Petrobras.  On this news, the Common ADS declined $1.55/share, closing on October 15, 2014, at $15.55/share, down from a close of $17.10/share on October 14, 2014.

186.    On October 16, 2014, prior to the opening of the markets, *Bloomberg* reported that Petrobras' costs for the Comperj refinery were set to increase by 60% based on a TCU audit report.  According to *Bloomberg's* summary of the TCU audit report, "[m]anagement has been 'reckless' with irregularities in the omission of technical analysis, overpaying for contracts and a lack of effective controls."  One member of the TCU audit committee stated that: "there were irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."  In light of the news that the newly-disclosed spiraling costs of Comperj were the result of irregularities at Petrobras, the price of Petrobras ADS and notes again fell.  The Common ADS closed on October 15, 2014, at $15.55/share, and closed the following day at $14.50/share.

187.    Over the weekend of October 18-19, 2014, President Roussef admitted for the first time that evidence existed of a kickback scheme at Petrobras.  During a political debate relating to the upcoming presidential election, Roussef stated that officials did not yet know how much money was involved in the kickback scheme or who was involved in the scheme, but that she would seek reimbursement of any funds illegally diverted from Petrobras.  The next trading day, the price of Petrobras ADS declined.  The Common ADS closed on October 17, 2014, at $14.93/share, and closed on October 20 at $14.00/share.

188.    On November 1, 2014, Brazilian newspaper *O Estado de S. Paulo* reported that Petrobras' auditor, PricewaterhouseCoopers ("PwC"), had refused to approve the Company's third quarter financials without a wider investigation into the corruption scandal.  On the next

trading day, the price of Petrobras ADS fell by almost 5%.  On October 31, 2014, Petrobras Common ADS closed at $11.70/share, and closed on $11.26/share on November 3, 2014. Similarly, on October 31, 2014, the Company's Preferred ADS closed at $12.23/share, and closed on $11.67/share on November 3, 2014.

189.    On Sunday, November 9, 2014, the *Financial Times* reported that the U.S. Department of Justice had opened a criminal investigation of Petrobras into whether Petrobras employees were paid bribes, and that the SEC had opened a corresponding civil investigation. The next day, the price of Petrobras ADS declined.  On November 7, 2014, Common ADS closed at $10.90/share, and closed on $10.62/share on November 10, 2014.  Similarly, on November 7, 2014, Preferred ADS closed at $11.27/share, and closed on $11.04/share on November 10, 2014.

190.    On the morning of November 13, 2014, *Bloomberg* published an article entitled "SBM Bribery Probe in Brazil Puts Petrobras Contacts at Risk."  The article announced that Brazil's comptroller general had commenced an action against SBM to determine whether it had paid bribes to Petrobras officials in connection with the broader scheme.  On November 12, 2014, Preferred ADS closed at $10.98/share, but then dropped to $10.52/share on November 13, 2014, after the market learned of the SBM bribery probe.

191.    After the stock markets closed on November 13, 2014, Petrobras shocked investors by announcing that it was delaying the release of its financial results for the third quarter.  Without providing specifics, the press release revealed that the allegations of bribery and corruption at Petrobras could impact its financial statements.  The Company stated in the press release:

> As has become known publicly, Petrobras is undergoing a unique
> moment in its history, in light of the accusations and investigations

of the "Lava Jato Operation" being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime against the company's former Downstream Director, Paulo Roberto Costa.  The former director is currently under investigation for corruption and embezzlement, among other offenses.

Faced with these circumstances, and considering the declarations of the former Downstream Director in a federal court on October 8, 2014 that, if found to be true, could potentially affect the company's financial statements, Petrobras has taken numerous steps aimed at furthering related investigations.

Within this context, on October 24 and 25, 2014 Petrobras hired two independent law firms specialized in conducting investigations – Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP – to examine the nature, extent and impact of the acts that may have been committed within the context of the allegations made by former Downstream Director Paulo Roberto Costa, as well as to investigate related facts and circumstances that have a significant impact on the company's business operations.  Hiring these independent firms was recommended by the Audit Committee of the Board of Directors in compliance with the best international practices and authorized by the Executive Board.

However, as a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements based on the accusations and investigations related to the "Lava Jato Operation" and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.

As a result, and in recognition of the importance of transparency, Petrobras expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014, reflecting its balance sheet based on facts that are known as of that date.

Petrobras is committed to releasing its third quarter 2014 results duly reviewed by its Independent Auditors as soon as possible. When the release date is set, Petrobras will inform the market at least 15 days in advance of publication.

192.    In light of this announcement, *Reuters* reported that analysts following the Company believed "the corruption probe and postponed earnings could result in [Petrobras] being stripped of its investment grade by ratings agencies and prompt it to write down fixed assets."   Moreover, "Petrobras could be barred from accessing bond markets in the United States."

193.    Furthermore, on November 14, 2014, Brazilian police made more significant arrests and conducted further raids as part of Operation Lava Jato.   First, they arrested Duque, the second former member of the Petrobras Diretoria to be apprehended.   Police also raided the officers of two cartel members – Odebrecht and Mendes Junior – seizing documents.

194.    Petrobras' stock price again tumbled.   Specifically, the Preferred ADS dropped from a close of $10.52/share on November 13, 2014, to a close of $10.23/share on November 14, 2014.

195.    On November 17, 2014, Petrobras held an earnings call with investors, even though it had not actually issued any financial results.   During that call, Foster told investors and analysts that "if found to be true," the accusations made in Operation Lava Jato "could potentially affect the Company's financial statements."

196.    Moreover, during the call Foster admitted that Petrobras' internal controls suffered from material weaknesses that needed to be addressed:   "[W]e need more time . . . to improve our internal controls. . . .   Petrobras has been taking various steps . . . .and has been adopting a number of actions aimed at strengthening its internal controls."

197.    In terms of the potential impact of the accusations on Petrobras' financial statements, Foster stated:   "You have an obligation to write off from the asset a cost related to corruption.   So the asset can give us the best return possible.   But still if there is a cost related to

corruption in the value of that asset, even if the asset can pay off that cost, you have an obligation to write off that cost, you have to discount that cost."

198.    In response to this news, the price of Petrobras ADS fell.  The Preferred ADS dropped from a close of $10.23/share on November 14, 2014, to a close of $9.64/share on November 17, 2014.

199.    However, following the November 17 conference call, it was not clear to investors how significant of a write-down or impairment of assets, if any, Petrobras would be making.  The vague statements on the conference call left stock analysts unable to quantify the amount of any write-down or impairment that Petrobras might make.

200.    On November 24, 2014, the *Financial Times* released an article titled:  "Petrobras scam allegations weigh on Brazil as blacklist fears rise."  The article disclosed that construction and engineering companies implicated by Operation Lava Jato could be "blacklisted from civil works," which would cause planned infrastructure projects in Brazil to "grind to a halt" and partially freeze the Brazilian economy.  On this news, Petrobras' ADS price tumbled.  The Preferred ADS dropped from a close of $11.44/share on November 21, 2014, to a close of $11.06/share on November 24, 2014

201.    Also on November 24, 2014, but after the markets closed, Petrobras issued a press release disclosing that it had received a subpoena from the SEC asking for documents "relating to the SEC's investigation of the Company."  On this news, Petrobras ADS again dropped.  The Preferred ADS dropped from a close of $11.06/share on November 24, 2014, to a close of $11.02/share on November 25, 2014.

202.    On November 28, 2014, *Bloomberg* directed investors to an article in *Valor Econômico* disclosing that Brazilian prosecutors had determined that Petrobras funds were being

embezzled into offshore bank accounts set up in tax havens, such as Hong Kong.  On this news, the Preferred ADS declined $1.00/share, or 8.92%, to close at $9.72/share.

203.    On November 30, 2014, *Bloomberg* circulated an article written by the Brazilian publication *Estadão*, reporting that the head of Petrobras' transportation subsidiary, Sergio Machado, had been forced to resign because of Operation Lava Jato.  According to *Estadão*, Costa had received the equivalent of US$280,000 in cash from Machado as part of the massive kickback and bribery scheme at Petrobras.   The next day, the Preferred ADS closed at $9.65/share, down 5.48% from the closing price of $10.21/share on the prior trading day.

204.    On December 2, 2014, Fitch Ratings issued a statement titled:   "Petrobras Corruption Scandal Pressuring Credit Quality."   Fitch disclosed that Petrobras' "contracting practices hold the potential to affect its credit quality to the extent it slows production growth, affects access to debt capital markets, and receives monetary penalties."   In response, the Preferred ADS closed down $0.14/share at $9.51/share on December 2, 2014.

205.    On December 12, 2014, Petrobras stated that it would not be releasing its third quarter financial results, as previously announced, because of "facts that occurred after November 13, 2014, directly or indirectly related to the 'Lava Jato Operation'."   According to Petrobras, it had obtained a waiver from its lenders granting it until January 31, 2015, to release the third quarter results.

206.    Also on December 12, 2014, *Valor* published an article summarizing the hundreds of documents it had reviewed from Fonseca detailing Foster's knowledge of the corruption in Petrobras' procurement process dating back to 2008.

207.    On Monday, December 15, 2014, Brazilian prosecutors announced that they had filed criminal charges against another former member of the Diretoria – Chief International Officer Cerveró.

208.    With Cerveró's arrest, Petrobras investors learned that the scope of the kickback and bribery scheme was even broader than originally thought.  Because of his position within the Diretoria as Chief International Officer, investors learned that the massive kickback and bribery scheme stretched beyond Brazil's borders.

209.    As news of the expanding scope of Operation Lava Jato was disbursed to the market, investors predictably reacted negatively and the price of Petrobras' ADS fell precipitously.  The Preferred ADS dropped from a close of $7.98/share on December 11, 2014, to a close of $6.66/share on December 15, 2014.

210.    On December 23, 2014, two additional partial disclosures were made relating to the massive kickback and bribery scheme as Petrobras.  First, Petrobras announced that it had formed a Special Committee to report directly to the Conselho de Administração about the internal probe being conducted of Petrobras by two law firms.  Second, Moody's announced that it had placed Petrobras' credit rating on review for downgrade directly as a result of Petrobras' failure to timely release its financial results, which was a byproduct of the Company being unable to fully measure the scope of the scheme and the fraud.  On this news, the Preferred ADS dropped from a close of $7.99/share on December 23, 2014, to a close of $7.95/share on December 24, 2014, and traded as low as $7.77/share on December 24th.

211.    On January 1, 2015, an article was published on *Petro Global News*, reporting that Petrobras was "teetering close to technical default as bondholders push for delayed results."

On this news, the Preferred ADSs declined $0.63/share, or 8.31%, to close at $6.95/share on January 2, 2015.

212.    On January 12, 2015, *Bloomberg* reported that a BofA analyst feared a potential ratings downgrade of Petrobras bonds to junk status as a result of the continuing disclosures from the massive kickback and bribery scheme.  Also on January 12, *Bloomberg* issued an article disclosing that Petrobras, "the oil producer at the center of Brazil's biggest corruption scandal, is delaying projects including a multibillion-dollar refinery after banning builders allegedly involved in the case."  On this news, the price of Common ADS dropped from a price of $7.06/share at close on January 9, 2015, to a closing price of $6.57/share on January 12, 2015. Similarly, the price of Preferred ADS dropped from a price of $7.16/share at close on January 9, 2015, to a closing price of $6.63/share on January 12, 2015.

213.    On January 17, 2015, *O Globo* reported that Nesto Cerveró blamed Petrobras' Board for errors at the Pasadena refinery. On January 18, 2015, Bloomberg reported that according to *Folha*, Petrobras may lose $3.2 billion related to the Abreu e Lima Refinery. On this news, the Common ADSs declined $0.25/share, or 3.54% on the next trading day, to close at $6.81/share on January 20, 2015, and the Preferred ADSs declined $0.08/share, or 1.11%, to close at $7.11/share on January 20, 2015.

214.    On January 22, 2015, after the market closed, *Bloomberg* disclosed that Brazilian prosecutors were preparing to announce "a new round of accusations" relating to the massive kickback and bribery scheme.  Specifically, the authorities were planning to seek indictments against several cartel members beyond those already named as potential targets of Operation Lava Jato on November 14, 2014.  On the next trading day, the price of Petrobras ADS fell by approximately 5%.  On January 22, 2015, Petrobras Common ADS closed at $11.70/share, and

closed on $11.26/share on January 23, 2015.  Similarly, on January 22, 2015, the Company's Preferred ADS closed at $7.65/share, and closed on $7.25/share on January 23, 2015.

215.    On January 27, 2015, Petrobras finally released its "Third Quarter of 2014 Results Not Reviewed by Independent Auditors."

216.    In the January 27 release accompanying the financial results, Petrobras acknowledged that there was substantial evidence that "specified Brazilian contractors and suppliers used funds from their contracts with Petrobras to make improper payments to political parties, Petrobras personnel and other persons in order to obtain contracts with Petrobras."

217.    The Company further admitted that its prior financial statements were materially false and misleading due to the improper capitalization of assets related to the bribery and kickback scheme:  "The Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount.  However, *those costs should not have been capitalized*."

218.    However, Petrobras informed the market that it was "impracticable" for the Company to actually quantify the amount that should not have been capitalized as PP&E:  "The Company believes it is necessary to correct the amounts related to the misconduct that were capitalized.  However, there are significant limitations to calculating the amounts related to the misconducts and, therefore, the correction of the errors and the interruption of future capitalization of those costs is impracticable."

219.    Petrobras did, however, provide a range of a potential write-down/impairment. According to the Company, between January 1, 2004, and April 30, 2012, there were US$73 billion of assets – which constituted 1/3 of the Company's total PP&E – that were the subject of contracts with cartel members.  Depending on the appraisal method used, Petrobras indicated

that the ultimate write-down/impairment of assets could range anywhere from US$1.5 billion to US$34 billion.  The US$34 billion figure represented the amount by which the carrying value exceeded the fair value of 31 appraised Petrobras assets.

220.    Petrobras also announced on January 27, 2015, that it had taken and would be taking further "measures to improve corporate governance and internal controls."  Specifically, on November 25, 2014, Petrobras' Conselho de Administração had created a new position on the Diretoria – an Executive Director of Governance, Risk and Compliance.  The purpose of this new position role was to "support[] the Company's compliance programs and mitigate[e] risks in its activities, including fraud and corruption."  Furthermore, "the Executive Director of Governance, Risk and Compliance will participate in the decisions of the [Diretoria], and any subjects submitted to the [Diretoria] for approval must previously be approved by this Director as they relate to governance, risk and compliance."

221.    Additionally, the Company announced on January 27, 2015, that it had formed a Special Committee to oversee its internal investigation.  The Special Committee "will act independently and will have a direct reporting line to the [Conselho de Administração], and report on the independent internal investigation being conducted by the two law firms, U.S. firm Gibson, Dunn & Crutcher LLP and Brazilian firm Trench, Rossi e Watanabe Advogados.  The Special Committee will be composed of Mrs. Ellen Gracie Northfleet, retired Chief Justice of the Brazilian Supreme Court, Mr. Andreas Pohlmann, Chief Compliance Officer of Siemens AG from 2007 to 2010, and the Executive Director of Governance, Risk and Compliance, João Adalberto Elek Junior[.]"

222.    When the markets opened on January 28, 2015, following the release of Petrobras' January 27 financial results and other disclosures, the price of Petrobras securities

tumbled almost 12%.  The Common ADS fell from $7.45/share to $6.56/share.   The Preferred ADS fell from $7.86/share to $6.94/share.

223.    On January 29, 2015, after the markets closed, the *Wall Street Journal* reported that Moody's had downgraded Petrobras rating to "Baa3" as a result of the corruption probe.  On this news, the Common ADSs declined $0.39/share or 6.09%, to close at $6.01/share on January 30, 2015, and the Preferred ADSs declined $0.46/share or 6.96%, to close at $6.15/share on January 30, 2015.

224.    On February 6, 2015, Petrobras announced that it had appointed a new chief executive, choosing the head of the nation's Banco do Brasil, Aldemir Benedine, to take charge of the Conselho de Administração following the abrupt resignations of most of the members of the Diretoria, including CEO Foster, CFO Barbassa, Chief Downstream/Supply Officer Cosenza, Chief Exploration and Production Officer José Miranda Formigli, Chief Gas and Power Officer José Alcides Santoro, and Chief Engineering, Technology and Procurement Officer Figueiredo due to the corruption charges.  On this news, the Common ADSs declined $0.57/share, or 8.02%, to close at $6.54/share on February 6, 2015, and the Preferred ADSs declined $0.63/share, or 8.73%, to close at $6.59/share on February 6, 2015.

**F.    The Fallout and Aftershock**

225.    The disclosure of the massive kickback and bribery scheme at Petrobras has shaken Brazil's largest company to its core, casting a dark shadow not only over its past but also its future.  Investors lost billions of dollars as a result of the scheme that permeated the highest levels of Petrobras' management.

226.    Operation Lava Jato has resulted in an almost complete overhaul of Petrobras' senior management.

227.    The Brazilian authorities have continued to make arrests and charge scores of individuals who were involved in the pervasive kickback and bribery scheme.

228.    On or around March 4, 2015, Brazilian prosecutors announced that they had asked the Brazilian Supreme Court to investigate fifty-four people, including several politicians, in the latest development in Operation Lava Jato.  Under Brazilian law, only the Supreme Court can try Brazilian lawmakers.

229.    On or around March 16, 2015, Brazilian prosecutors filed criminal charges against twenty-seven individuals, including the Treasurer of the PT, José Vaccari, and former Petrobras Chief Services Officer Duque.

230.    On or around May 14, 2015, Brazilian prosecutors charged four Brazilian politicians with money laundering, embezzlement and other crimes in connection with activities at Petrobras.

231.    On or about June 19, 2015, Brazilian police arrested the CEOs of two cartel members:  Odebrecht and Andrade Gutierrez.

232.    On or about July 2, 2015, former Chief International Officer Zelada was arrested by Brazilian authorities for accepting bribes.

233.    Several individuals caught by Operation Lava Jato have been convicted of corruption, money laundering and/or conspiracy for their role in the massive kickback and bribery scheme at Petrobras:

- Costa was sentenced to seven and a half years' incarceration. However, because of his cooperation with prosecutors, he will be on house arrest for the first year and then will wear an electronic ankle bracelet allowing him to leave his house during the daytime for the remainder of the sentence.

- Youssef was sentenced to nine years' incarceration.  Although he also cooperated with authorities, he will serve three years hard time in prison, but will then be released on work release.

- Cerveró was convicted of money laundering and was sentenced to five years in prison.

- The former president and vice president of cartel member Camargo Correa – both of whom cooperated with prosecutors – were convicted of corruption, money laundering and conspiracy, and each were sentenced to over fifteen years of house arrest.

- The former chairman of Camargo Correa, who refused to cooperate with authorities, was sentenced to nine and a half years in prison.

234.     While the investigation is still ongoing, there can be no questioning the enormity of the fallout from the massive kickback and bribery scheme at Petrobras.  According to an August 7, 2015 *New York Times* article, "[t]o date, 117 indictments have been issued, five politicians have been arrested, and criminal cases have been brought against 13 companies."

235.     Because of Operation Lava Jato, Petrobras postponed indefinitely construction of Comperj and the second refining unit at Abreu.

236.     Petrobras' bond ratings have also suffered.  On February 24, 2015, Moody's downgraded Petrobras notes to "junk" status.

237.     Petrobras has made several admissions about the kickback scheme in its SEC filings in 2015.

238.     Specifically, in its annual report for 2014 filed on Form 20-F on May 15, 2015, Petrobras again conceded that its prior financial statements were materially false and misleading due to the improper accounting of inflated prices paid by Petrobras:

> Over the course of 2014, the Brazilian Federal Prosecutor's Office focused part of its [Lava Jato] investigation on irregularities involving Petrobras' contractors and suppliers and uncovered a

broad payment scheme that involved a wide range of participants. . . .

We believe that under IAS 16, *the amounts we overpaid pursuant to this payment scheme should not have been included in the historical costs of our property, plant and equipment*.

239.    Petrobras also laid out the glaring deficiencies in its internal controls that existed prior to 2015, which it is purportedly attempting to remedy:

*Our management identified a number of material weaknesses in our internal control over financial reporting in 2014*.  For example, management overrides by certain former Petrobras personnel relating to our large investment projects in the Exploration and Production, Refining, and Gas and Power business segments did not comply with our existing internal controls over the process of contracting for services in these segments.

In addition, our management identified material weaknesses related to (i) internal controls over property, plant and equipment (specifically with respect to the evaluation of the financial condition of our contractors and suppliers, termination costs and write-downs of payments made in advance, among others), (ii) the review and approval of manual journal entries, and (iii) managing access to critical transactions in our systems and segregation of duties.  *As a result, our management concluded that our internal control over financial reporting was not effective at December 31, 2014*.  Although we have developed and implemented several measures to remedy these material weaknesses, we cannot be certain that there will be no other material weaknesses in our internal control over financial reporting in the future.

240.    Despite its repeated assertions that the total overpayments Petrobras made on cartel contracts cannot be accurately calculated based on currently available information, on April 22, 2015 (after several investor lawsuits were filed against it), Petrobras attempted to quantify the impact of the massive bribery and kickback scheme on its financial statements.  In its published financial statements, Petrobras wrote down only US$2.527 billion of capitalized costs in the third quarter of 2014, which, according to Petrobras, "represent[ed] amounts that Petrobras overpaid for the acquisition of property, plant and equipment in prior years."  This

amount constitutes 3% (plus and minus some accounting adjustments) of the US$81.440 billion of contracts between Petrobras and known cartel members entered into between 2004 and April 2012.

241.    However, the methodology employed by Petrobras to reach the US$2.527 billion figure is fundamentally flawed because, among other things, it improperly assumes that the overpayment amount paid to the cartel members was limited to the 3% kickback paid by the cartel on each contract.  As this Court correctly recognized in its July 30, 2015 Opinion in the matter *In re Petrobras Securities Litigation*, 1:14-cv-09662-JSR:  "[I]t does not follow that Petrobras paid only three percent more on the cartel contracts than it would have under an honest bidding system.  If the cartel companies were paying three percent bribes and kickbacks, it is reasonable to infer that the corruption scheme allowed them to inflate the contract prices *by considerably more than three percent*.  Otherwise, the bribery scheme would not be worth their while."

242.    Indeed, while Petrobras has attempted to minimize the impact on its financial statements of the overpayments it made as a result of the massive kickback and bribery scheme by using a flawed methodology, it has contradicted itself by conceding in its 2014 annual report that it "*cannot specifically identify either the individual contractual payments that include overcharges or the reporting periods in which overpayments occurred*."  Apparently aware of this contradiction, Petrobras has bubble-wrapped its US$2.527 billion write-down with extensive qualifiers and cautionary disclaimers.  For example, Petrobras warned in its 2014 annual report that:

> The Lava Jato investigation is still ongoing and it could be a significant amount of time before the Brazilian federal prosecutors conclude their investigation.  As a result of this investigation, *substantive additional information might come to light in the*

> ***future that would make our estimate for overpayments appear, in
> retrospect, to have been materially low*** or high, which may require
> us to restate our financial statements to further adjust the write-offs
> representing the overstatement of our assets recognized in our
> interim consolidated financial statements for the nine-month period
> ended September 30, 2014.
>
> . . . [O]ur estimation methodology involves some degree of
> uncertainty.  ***There can be no assurance that the write-offs
> representing the overstatement of our assets***, determined using
> our estimation methodology, and recognized in our interim
> consolidated financial statements for the nine-month period ended
> September 30, 2014, ***are not underestimated*** or overestimated. In
> the event that we are required to write-off additional historical
> costs from our property, plant and equipment or to reverse write-
> offs previously recognized in our financial statements, this might
> impact the total value of our assets and we may be subject to
> negative publicity, credit rating downgrades, or other negative
> material events, which may have a material adverse effect on our
> results of operations and financial condition and affect the market
> value of our securities.

243.    Moreover, in its April 22, 2015 financial statements, Petrobras recognized an
impairment loss of US$16.788 billion on its PP&E (above and beyond the US$2.527 billion
write-down), which in large part almost certainly relates to the kickback and bribery scheme.
The majority of the US$16.788 billion impairment loss recognized by the Company emanates
from the Abreu and Comperj refineries – the two projects that Costa, Barusco and Youssef
testified were dominated by the cartel.   Petrobras vaguely described the impairment losses
associated with Abreu and Comperj as being the result of:  "(i) project planning deficiencies; (ii)
the use of a higher discount rate, reflecting a specific risk premium for the postponed projects;
(iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the
Company's business context of lower projected economic growth."  The opaque reference to
"project planning deficiencies" indicates that the impairment loss recognized by the Company is
tied to the massive kickback and bribery scheme.

244.    Petrobras' April 22, 2015 financials were highly controversial within Petrobras, causing a rift amongst pro-government members, on the one hand, and the independent members, on the other, of the Conselho de Administração.  The independent directors dissented from the Company's decision to release the numbers.  According to the *Wall Street Journal*, the independent directors complained that they were not afforded sufficient time to review the documentation supporting the PP&E write-down and impairment.  They also criticized the Company's methodology for calculating the write-down and impairment.  After the meeting, all three directors left the Conselho de Administração.  One of the directors, José Guimarães Monforte, appears to have resigned directly as a result of his disagreement with the release of the financials on April 22, 2015.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE EXCHANGE ACT CLAIMS

### A.    Materially False and Misleading Financial Reporting

245.    From November 23, 2010 through August 11, 2014, Petrobras made materially false and misleading statements in its financial statements filed with the SEC every quarter and at the end of each fiscal year.

246.    The total assets, PP&E, and net income that Petrobras reported in these financial statements were materially overstated, and its costs and expenses were materially understated, because Petrobras improperly capitalized the amounts that it overpaid as a result of the massive kickback and bribery scheme.

247.    Indeed, Petrobras has conceded as such in subsequent filings.  In its annual report for the year ended December 31, 2014, which was filed with the SEC on May 15, 2015, Petrobras admitted the following:

> Under the [massive kickback and bribery] scheme, a large number
> of contractors and suppliers colluded with . . . former Petrobras

personnel to overcharge Petrobras under construction contracts and contracts to provide Petrobras with goods and services, and used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or . . . former Petrobras personnel.

In particular, the former Chief Downstream Officer, the former Chief Services Officer and the former executive manager of the Services area of Petrobras were involved in the payment scheme. Those individuals, who were all in positions of authority at Petrobras, not only failed to report the existence of the cartel, but they also used their influence to further the objectives of the payment scheme, primarily by ensuring that the cartel members would be selected to participate in bidding rounds for goods and services contracts with Petrobras so that the cartel members would secure contracts with the Company. . . .

. . .

Based on the available information described above, the Company [has] concluded that the portion of the costs incurred to build its property, plant and equipment that resulted from contractors and suppliers in the cartel overcharging the Company to make improper payments should not have been capitalized.

248.    Although Petrobras has stated that it is "impracticable" to quantify the exact amount of the overpayments that should not have been capitalized, it is clear from the testimony of Costa, Barusco and Youssef that Petrobras paid around 20% over its basic budget on every cartel contract when a competitive bidding process would have yielded a radically lower contract price. Petrobras has identified at least US$81.440 billion of cartel contracts implicated by the massive kickback and bribery scheme. Thus, Petrobras radically overpaid to the tune of billions of dollars. Indeed, one Petrobras estimate calculates the carrying value of certain assets subject to cartel contracts is overstated by US$34 billion.

249.    Petrobras also accepted bribes for inflated contract prices on projects that did not involve members of the cartel. The overpayments on these contracts also should not have been capitalized by Petrobras.

250.   Petrobras' accounting for the overpayments violated both U.S. and international generally accepted accounting principles described above in paragraphs 86-92.  The kickbacks paid by the contractors and the resulting overpayments by Petrobras were not costs necessary to bring Petrobras' assets to working condition and provided no future economic benefit to Petrobras.  Thus, they should have been recorded as expenses rather than capitalized as assets.

251.   By wrongfully recognizing the overpayments as assets instead of expenses, Petrobras materially overstated the amount of its assets and PP&E in its quarterly and annual financials.  Furthermore, Petrobras misreported its net income in its quarterly and annual financials by failing to record an impairment loss.  Finally, Petrobras understated its costs and expenses in its quarterly and annual financials.  The amounts misreported by Petrobras during the relevant period were as follows:

- On November 23, 2010, Petrobras announced its results for the third quarter of 2010.  It filed these financial statements with the SEC on Form 6-K on November 24, 2010.  In these financial statements, Petrobras materially misreported assets as US$298.136 billion, PP&E as US$206.278 billion, year-to-date net income of US$13.288 billion, and year-to-date costs & expenses of US$69.854 billion.

- On March 15, 2011, Petrobras announced its results for the fourth quarter of 2010.  It filed these financial statements with the SEC on Form 6-K on March 17, 2011.  In these financial statements, Petrobras materially misreported assets as US$308.683 billion, PP&E as US$218.567 billion, year-to-date net income of US$19.184 billion, and year-to-date costs & expenses of US$95.894 billion.

- On May 24, 2011, Petrobras announced its results for the first quarter of 2011.  It filed these financial statements with the SEC on Form 6-K on May 26, 2011.  In these financial statements, Petrobras materially misreported assets as US$330.551 billion, PP&E as US$230.370 billion, year-to-date net income of US$6.524 billion, and year-to-date costs & expenses of US$25.219 billion.

- On May 25, 2011, Petrobras issued its 2010 annual report.  It filed the annual report with the SEC on Form 20-F on May 26, 2011.  In its 2010 annual report, Petrobras materially misreported assets as US$308.683 billion, PP&E as US$218.567 billion, year-to-date net income of US$19.184 billion, and year-to-date costs & expenses of US$95.894 billion.

- On August 24, 2011, Petrobras announced its results for the second quarter of 2011.  It filed these financial statements with the SEC on Form 6-K on August 25, 2011.  In these financial statements, Petrobras materially misreported assets as US$350.661 billion, PP&E as US$247.276 billion, year-to-date net income of US$13.172 billion, and year-to-date costs & expenses of US$56.382 billion.

- On November 22, 2011, Petrobras announced its results for the third quarter of 2011.  It filed these financial statements with the SEC on Form 6-K on November 22, 2011.  In these financial statements, Petrobras materially misreported assets as US$308.956 billion, PP&E as US$220.306 billion, year-to-date net income of US$17.031 billion, and year-to-date costs & expenses of US$87.921 billion.

- On February 28, 2012, Petrobras announced its results for the fourth quarter of 2011.  It filed these financial statements with the SEC on Form 6-K on February 29, 2012.  In these financial statements, Petrobras materially misreported assets as US$319.410 billion, PP&E as US$182.465 billion, year-to-date net income of US$20.121 billion, and year-to-date costs & expenses of US$110.102 billion.

- On March 30, 2012, Petrobras issued its 2011 annual report.  It filed the annual report with the SEC on Form 20-F on April 2, 2012.  In its 2011 annual report, Petrobras materially misreported assets as US$319.410 billion, PP&E as US$182.465 billion, year-to-date net income of US$20.121 billion, and year-to-date costs & expenses of US$110.102 billion.

- On May 15, 2012, Petrobras announced its results for the first quarter of 2012.  It filed these financial statements with the SEC on Form 6-K on May 17, 2012.  In these financial statements, Petrobras materially misreported assets as US$310.704 billion, PP&E as US$184.997 billion, year-to-date net income of US$5.212 billion, and year-to-date costs & expenses of US$30.751 billion.

- On August 3, 2012, Petrobras announced its results for the second quarter of 2012. It filed these financial statements with the SEC on Form 6-K on August 10, 2012. In these financial statements, Petrobras materially misreported assets as US$337.917 billion, PP&E as US$194.099 billion, year-to-date net income of US$4.527 billion, and year-to-date costs & expenses of US$62.721 billion.

- On October 26, 2012, Petrobras announced its results for the third quarter of 2012. It filed these financial statements with the SEC on Form 6-K on October 30, 2012. In these financial statements, Petrobras materially misreported assets as US$318.467 billion, PP&E as US$191.395 billion, year-to-date net income of US$7.271 billion, and year-to-date costs & expenses of US$94.855 billion.

- On February 4, 2013, Petrobras announced its results for the fourth quarter of 2012. It filed these financial statements with the SEC on Form 6-K on February 6, 2013. In these financial statements, Petrobras materially misreported assets as US$331.645 billion, PP&E as US$204.901 billion, year-to-date net income of US$11.034 billion, and year-to-date costs & expenses of US$127.727 billion.

- On April 26, 2013, Petrobras issued its 2012 annual report. It filed the annual report with the SEC on Form 20-F on April 29, 2012. In its 2012 annual report, Petrobras materially misreported assets as US$331.645 billion, PP&E as US$204.901 billion, year-to-date net income of US$11.034 billion, and year-to-date costs & expenses of US$110.102 billion.

- Also on April 26, 2013, Petrobras announced its results for the first quarter of 2013. It filed these financial statements with the SEC on Form 6-K on April 30, 2013. In these financial statements, Petrobras materially misreported assets as US$345.274 billion, PP&E as US$214.457 billion, year-to-date net income of US$3.854 billion, and year-to-date costs & expenses of US$31.410 billion.

- On August 9, 2013, Petrobras announced its results for the second quarter of 2013. It filed these financial statements with the SEC on Form 6-K on August 13, 2013. In these financial statements, Petrobras materially misreported assets as US$338.068 billion, PP&E as US$203.716 billion, year-to-date net income of US$6.850 billion, and year-to-date costs & expenses of US$61.613 billion.

- On October 25, 2013, Petrobras announced its results for the third quarter of 2013.  It filed these financial statements with the SEC on Form 6-K on October 28, 2013.  In these financial statements, Petrobras materially misreported assets as US$340.106 billion, PP&E as US$208.362 billion, year-to-date net income of US$11.094 billion, and year-to-date costs & expenses of US$93.167 billion.

- On February 25, 2014, Petrobras announced its results for the fourth quarter of 2013.  It filed these financial statements with the SEC on Form 6-K on February 26, 2014.  In these financial statements, Petrobras materially misreported assets as US$321.423 billion, PP&E as US$227.901 billion, year-to-date net income of US$11.094 billion, and year-to-date costs & expenses of US$125.768 billion.

- On April 30, 2014, Petrobras issued its 2013 annual report.  It filed the annual report with the SEC on Form 20-F on April 30, 2012. In its 2013 annual report, Petrobras materially misreported assets as US$321.423 billion, PP&E as US$227.901 billion, year-to-date net income of US$11.094 billion, and year-to-date costs & expenses of US$125.768 billion.

- On May 9, 2014, Petrobras announced its results for the first quarter of 2014.  It filed these financial statements with the SEC on Form 6-K on May 12, 2014.  In these financial statements, Petrobras materially misreported assets as US$354.403 billion, PP&E as US$240.793 billion, year-to-date net income of US$2.280 billion, and year-to-date costs & expenses of US$31.433 billion

- On August 8, 2014, Petrobras announced its results for the second quarter of 2014.  It filed these financial statements with the SEC on Form 6-K on August 11, 2014.  In these financial statements, Petrobras materially misreported assets as US$363.392 billion, PP&E as US$253.955 billion, year-to-date net income of US$4.775 billion, and year-to-date costs & expenses of US$64.514 billion.

252.   Each of Petrobras' annual reports were signed by either Gabrielli or Foster (depending on who was CEO at the time), and by the Company's CFO Almir Guilherme Barbassa.

253.    In its 2012 annual report filed with the SEC on April 29, 2013, and again in its

2013 annual report filed with the SEC on April 30, 2014, Petrobras stated that:

> Property, plant and equipment are measured at the cost to acquire
> or construct, including all costs necessary to bring the asset to
> working condition for its intended use, adjusted during
> hyperinflationary periods, as well as by the present value of the
> estimated cost of dismantling and removing the asset and restoring
> the site and reduced by accumulated depreciation and impairment
> losses.

254.    These statements were materially false and misleading for the reasons described

above in paragraphs 246 through 251.

255.    Each of Petrobras' quarterly financial statements filed on Form 6-K between

November 24, 2010 and November 22, 2011, and Petrobras' 2010 annual report filed on Form

20-F on May 26, 2011, contained a statement that they were prepared in accordance with U.S.

GAAP.  Similarly, each of Petrobras' first, second and third quarter financial statements filed on

Form 6-K between May 17, 2012 and August 11, 2014, contained a statement that they were

prepared "in accordance with IAS 34 - Interim Statements, issued by the International

Accounting Standards Board (IASB)."  Finally, each of Petrobras' annual reports filed on Form

20-F between April 2, 2012, and April 30, 2014, as well as each of Petrobras' fourth quarter

financial statements filed on Form 6-K between February 29, 2012 and February 26, 2014,

contained a statement that they were prepared or presented "in conformity with International

Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board

(IASB)."  These statements were materially false and misleading for the reasons described above

in paragraphs 246 through 251.

256.    Moreover, Petrobras' CEO and CFO filed materially false and misleading

certifications with each of Petrobras' annual reports in which they stated that such reports did

"not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made, not misleading," and that the financial statements therein "fairly present in all material respects the financial condition, results of operations and cash flows of the Company."

257.   Gabriella and Barbassa made these false and misleading statements in certifications attached to Petrobras' 2010 annual report, filed with the SEC on May 26, 2011. Foster and Barbassa made these false and misleading statements in certifications attached to Petrobras' 2011, 2012, and 2013 annual report filed with the SEC on April 2, 2012, April 29, 2013, and April 30, 2014, respectively.   These statements were materially false and misleading for the reasons described above in paragraphs 246 through 251.

258.   Petrobras also made materially false and misleading statements about the accuracy of its financial reporting on *Facts and Data*.   On December 29, 2012, Petrobras misrepresented that it "complies with the requirements of such agencies as the Securities Values Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbannes-Oxley [*sic*] law."   These statements were materially false and misleading for the reasons described above in paragraphs 246 through 251.

### B.   Materially False and Misleading Denials of Overbilling and Corruption

259.   Between January 2013 and September 2014, Petrobras officials repeatedly and persistently denied that any overbilling or corruption was occurring in the Company's operations.   Instead, Petrobras touted its purported strong corporate governance, transparency, ethical culture, and compliance with disclosure requirements.   These statements were all materially false and misleading, as explained below.

260.   In a January 7, 2013 posting on *Facts and Data*, Petrobras "reiterate[d] that there are no irregularities in the construction of the Abreu e Lima Refinery in Penambuco."

261.    On May 25, 2014, Petrobras affirmatively misrepresented to investors on *Facts and Data* that there were "no indications of irregularities" and that "there has been no overpricing or overbilling in the works of the Abreu e Lima Refinery."

262.    These statements about Abreu were materially false and misleading.  As explained in more detail above in paragraphs 120 through 121, the documents and testimony provided by cooperating witnesses in Operation Lava Jato show that overbilling and kickbacks were pervasive in the Abreu contracts.

263.    Petrobras also made misrepresentations about the absence of overbilling and corruption at its other major new refinery project, Comperj.

264.    In a January 7, 2013 posting on *Facts and Data*, Petrobras "reaffirm[ed] that there are no irregularities in the Rio de Janeiro Petrochemical Complex works."

265.    This statement about Comperj was materially false and misleading.  Barusco testified that the cartel intervened in Comperj in the same manner that they had done at Abreu, "offer[ing] prices excessively over the internal budget."

266.    Petrobras also made multiple misrepresentations about the absence of overbilling and corruption at Pasadena.  On August 6, 2013, Gabrielli appeared before a Brazilian congressional committee to answer questions about Pasadena.  According to *Facts and Data*, Gabrielli told the committee members that statements in the press alleging overbilling and irregularities at Pasadena were a result of "ignorance of the petroleum and derivatives market."

267.    On May 12, 2014, Foster told investors and analysts during Petrobras' first quarter earnings call:  "there are no facts or documents that would document the payment of bribery to any employees of Petrobras."

268.    On May 23, 2014, Petrobras issued a posting on *Facts and Data* stating:

Payments of any sort made and in any country follow rigid, clear internal procedures and pertinent legislation. In addition, we have a well-structured Internal Auditing area that has access to any unit in the Petrobras System to verify the conformity of procedures and operations carried out.

In addition to our internal processes, we have our accounts and balances audited by external auditors and, being a company with shares on the stock market, we are subordinate to market regulator organs, the Securities and Exchange Commission of Brazil (CVM) and the U.S. (SEC), and all the rules of information governance and dissemination relevant to the market. Our contracts are overseen by such control agencies and the Court of Accounts of the Union (TCU) and the Comptroller of the Union (CGU).

In regards to the Pasadena refinery, the final values of the purchase arise not just from negotiations between the parties but also from arbitration and judicial procedures.

269.    On July 12, 2014, Petrobras stated on *Facts and Data* that "[i]n regard to the purchase of the Pasadena Refinery, contrary to what the report says, Petrobras did not pay 'extremely in excess.'"

270.    These statements about Pasadena were materially false and misleading. Costa told Brazilian authorities that he personally received a bribe of US$1.5 million in connection with the purchase of Pasadena. Moreover, Cerveró received US$20-30 million in bribes in connection with the Pasadena transaction, which resulted in Petrobras substantially overpaying for the Texas refinery.

271.    Petrobras made numerous misrepresentations about the absence of bribery with respect to its transactions with SBM. In March 2014, Petrobras established an "Internal Verification Commission" to purportedly investigate bribery allegations about SBM. On July 12, 2014, *Facts and Data* reported that Petrobras employees did not receive bribes from SBM: "[T]he Internal Verification Commission . . . **did not find facts or documents indicating the payment of bribes to Petrobras employees**."

272.    This statement was materially false and misleading.  In November 2014, SBM agreed to pay US$240 million to The Netherlands's prosecution office in a settlement of a case that included allegations of improper payments to Petrobras.  Moreover, Barusco received at least US$22 million of bribes paid by SBM.

273.    Petrobras misleadingly emphasized the lack of any corruption at the Company in the Underwriting Agreement signed in connection with the March 2014 Offering, which Petrobras filed as an exhibit to a Form 6-K on March 11, 2014:

> Neither [Petrobras] nor any of Petrobras' subsidiaries, nor any director or executive officer of [Petrobras] or any of Petrobras' subsidiaries, nor, to the best knowledge of [Petrobras], any agent, employee or other person associated with or acting on behalf of [Petrobras] or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - Nova Lei Anticorrupção Brasileira of 2013 (New Brazilian Anti-Corruption Law); or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

274.    This statement was materially false and misleading because Petrobras executives passed along kickbacks received from Petrobras contractors as political patronage.  Moreover, Petrobras' complicity in the kickback scheme meant that they made "indirect" unlawful payments to government officials.  Indeed, the U.S. Department of Justice is currently investigating Petrobras for violations of the Foreign Corrupt Practices Act.

275.    Petrobras also repeatedly touted that it had a strong ethics policy, and that it was an honest and transparent organization.

276.    In a December 29, 2012 post on *Facts and Data*, Petrobras wrote:

[A]ll the activities of Petrobras and its employees are fully oriented by principles of ethics and transparency. The Petrobras system denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests. . . .

All Petrobras activities are accompanied by the Conselho de Administração composed of representatives of the Government and private shareholders. Petrobras has its accounts analyzed in a permanent and continuous manner by internal and external auditors under the auspices of the Comptroller General of the Union (CGU) and the Court of Accounts of the Union (TCU). The Company complies with the requirements of such agencies as the Securities Value Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbannes-Oxley [sic] law, having had all its balances audited and approved in all instances. In 2012, for the 12th consecutive year, Petrobras was honored with the Transparency Trophy awarded by the National Association of Finance, Administration and Accounting Executives (ANEFAC), the Institute of Accounting, Actuaries and Financiers Research Foundation (FIPECAFI) and Serasa Experian.

277.     In its 2013 annual report filed with the SEC on April 30, 2014, Petrobras stated emphatically: "We guide our business and our relations with third parties by ethical principles." Petrobras made identical representations in its 2012 and 2011 annual reports. In its 2010 annual report filed with the SEC on May 26, 2011, Petrobras stated: "We have *always* guided our business and our relations with third parties by strong ethical principles."

278.     These statements concerning Petrobras' ethics and transparency were materially false and misleading. By the Company's own admission, beginning at least as early as 2004 and continuing at least through April 2012, Petrobras' most senior executives engaged in a massive kickback scheme to line their own and their political godfathers' pockets with bribes, causing Petrobras to radically overpay its contractors. Rather than push back against the cartel of contractors who extorted the Company, Petrobras executives facilitated the cartel for personal financial gain, political patronage, and to enable the Company to curry favor with its political masters. Moreover, when lower-level employees attempted to blow the whistle on the massive

kickback and bribery scheme, Petrobras executives marginalized, threatened and transferred those employees to different countries.  Rather than being guided by principles of "ethics" and "transparency," Petrobras' leaders were instead embroiled in a web of corruption and graft. Concealment of the bribery scheme enabled the Company to misrepresent its PP&E and other financial metrics to investors, thereby enabling it to access the capital markets for much needed funds.

### C.  Materially False and Misleading Statements Concerning Effectiveness of Internal Controls

279.    With each of its annual reports filed with the SEC on Form 20-F, Petrobras' CEO and CFO filed certifications concerning the purported effectiveness of Petrobras' internal controls and disclosure procedures.

280.    The CEO and CFO both certified that, among other things:

> 4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:
>
> (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

281. These certifications were made by Gabrielli and Barbassa for the 2010 annual report, and by Foster and Barbassa for the 2011, 2012, and 2013 annual reports.

282. Moreover, Petrobras' 2010 annual report filed on Form 20-F on May 26, 2011, contained the following statement:

> Each of the Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, each of the Company's management has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective..

283.    Petrobras' 2011 annual report filed on Form 20-F on April 2, 2012, contained the

following statement:

> Each of the Company's management has assessed the effectiveness
> of each Company's internal control over financial reporting as of
> December 31, of the reporting year], based on the criteria
> established in Internal Control—Integrated Framework issued by
> the Committee of Sponsoring Organizations of the Treadway
> Commission (COSO).  Based on such assessment and criteria, each
> of the Company's management has concluded that each
> Company's internal control over financial reporting was effective
> as of December 31, [of the reporting year].

284.    Additionally, Petrobras' 2012 and 2013 annual reports filed on Form 20-F on

April 29, 2013, and April 30, 2014, respectively, contained the following statement.

> Our management has assessed the effectiveness of our internal
> control over financial reporting as of December 31, [of the
> reporting year], based on the criteria established in Internal
> Control—Integrated Framework (1992) issued by the Committee
> of Sponsoring Organizations of the Treadway Commission
> (COSO).  Based on such assessment and criteria, the Company's
> management has concluded that [the] Company's internal control
> over financial reporting was effective as of December 31, [of the
> reporting year].

285.    These statements were materially false and misleading.   Petrobras' internal

controls were almost entirely non-existent.   As explained above, the utter ineffectiveness of

Petrobras' internal controls allowed Petrobras' most senior executives to engage in a massive

kickback and bribery scheme that caused Petrobras to radically overpay its contractors, and

allowed the executives to prevent this scheme from being revealed for many years.

286.    Indeed, the Company has since conceded that material weaknesses existed in its

internal controls.  The Company summarized its findings as follows:

> We have evaluated, with the participation of our Chief Executive
> Officer and Chief Financial Officer, the effectiveness of our
> disclosure controls and procedures as of December 31, 2014.
> Based upon our evaluation, our Chief Executive Officer and Chief
> Financial Officer concluded that **as a result of the material**

> ***weaknesses in our internal control over financial reporting
> described below, as of December 31, 2014 our disclosure controls
> and procedures were not effective*** to provide reasonable assurance
> that information required to be disclosed by us in the reports that
> we file or submit under the Exchange Act is recorded, processed,
> summarized and reported, within the time periods specified in the
> applicable rules and forms, and that it is accumulated and
> communicated to our management, including our Chief Executive
> Officer and Chief Financial Officer, as appropriate to allow timely
> decisions regarding required disclosure.

287. In its 2014 annual report, Petrobras identified material weaknesses in:   (1)
management's override of controls; (2) controls related to PP&E; (3) review and approval of
manual journal entries; (4) and access management and segregation of duties.

288. In particular, Petrobras described the material weaknesses in management's
override of controls:

> During 2014, our management identified certain decisions taken
> during the period between 2004 and April 2012, specifically
> relating to our large investment projects in the Exploration and
> Production, Refining, and Gas and Power business segments, that
> did not comply with our existing internal controls over the process
> of contracting services in these segments.   The internal controls
> over contracting of services include procedures such as the
> Petrobras Contracting Manual (Manual da Petrobras de
> Contratação – MPC) and the Investment Projects Corporate
> Procedures (Sistemática Corporativa de Projetos de Investimento).
>
> In some of our contracting processes, one or more senior
> managers, together with third parties (namely, some of the
> contractors and suppliers involved in the construction projects),
> colluded to eliminate, infringe upon, override or circumvent these
> controls, which resulted in the commission of wrongful acts
> contrary to our interests and policies. Our management has
> identified the following internal control deficiencies related to the
> failure to detect these acts that together constitute a material
> weakness in our control environment: (i) inadequate "tone at the
> top" regarding internal controls; (ii) failure to communicate the
> ethical values prescribed in our Code of Conduct; and (iii) lack of
> an effective whistleblower program.
>
> These deficiencies contributed to our failure to prevent an
> overstatement of property, plant and equipment.

289.    Thus, by its own admission, all of Petrobras' and Foster's statements set forth above about the effectiveness of Petrobras' internal controls between 2004 and 2014 were materially false and misleading.

## VI.    SUMMARY OF SCIENTER ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS

### A.    Petrobras' Corporate Scienter

290.    Petrobras knowingly or recklessly made the materially false and misleading misrepresentations alleged herein.  Petrobras' most senior executives participated in, facilitated and benefitted from the massive kickback and bribery scheme that caused Petrobras to radically overpay for its contracts.  Their scienter is imputable to Petrobras.

291.    Petrobras has itself admitted in documents filed with the SEC that several of its former executives were participants in the scheme.  In its 2014 annual report, Petrobras detailed its senior executives' role:

> According to testimony from Brazilian criminal investigations that became available beginning October 2014, *senior Petrobras personnel conspired with contractors, suppliers and others from 2004 through April 2012 to establish and implement an illegal cartel that systematically overcharged the Company in connection with the acquisition of property, plant and equipment*. Two Petrobras executive officers (*diretores*) and one executive manager were involved in this payment scheme . . . ; they are referred to below as the "former Petrobras personnel."  The overpayments were used to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, the former Petrobras personnel and other individuals involved in the payment scheme.
>
> . . .
>
> In 2009, the Brazilian federal police began an investigation called "Lava Jato" (Car Wash) aimed at criminal organizations engaged in money laundering in several Brazilian states.  The Lava Jato Operation is extremely broad and involves numerous investigations into several criminal practices focusing on crimes

committed by individuals in different parts of the country and sectors of the Brazilian economy.

Over the course of 2014, the Brazilian Federal Prosecutor's Office focused part of its investigation on irregularities involving Petrobras' contractors and suppliers and uncovered a broad payment scheme that involved a wide range of participants, including the former Petrobras personnel. Based on the information available to Petrobras, the payment scheme involved a group of 27 companies that, between 2004 and April 2012, colluded to obtain contracts with Petrobras, overcharge the Company under those contracts and use the overpayment received under the contracts to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, the former Petrobras personnel and other individuals involved in the scheme. Petrobras refers to this scheme as the "payment scheme" and to the companies involved in the scheme as "cartel members."

In addition to the payment scheme, the investigations identified several specific instances of other contractors and suppliers that allegedly overcharged Petrobras and used the overpayment received from their contracts with the Company to fund improper payments, unrelated to the payment scheme, to certain Petrobras employees, including the former Petrobras personnel and a former Chief International Officer. Those contractors and suppliers are not cartel members and acted individually. Petrobras refers to these specific cases as the "unrelated payments."

In connection with the investigation of the payment scheme, Paulo Roberto Costa, a former Chief Downstream Officer of Petrobras, was arrested in March 2014 and subsequently charged for money-laundering and passive corruption. Other former executives of Petrobras, including Renato de Souza Duque (a former Chief Services Officer), Nestor Cerveró (a former Chief International Officer) and Pedro José Barusco Filho (a former executive manager of the Services area), as well as former executives of Petrobras contractors and suppliers, have been or are expected to be charged as a result of the investigation.

. . .

**The information available to the Company is generally consistent with respect to the existence of the payment scheme, the companies involved in the payment scheme, the former Petrobras personnel involved in the payment scheme, the period during which the payment scheme was in effect, and the maximum**

> *amounts involved in the payment scheme relative to the contract values of affected contracts.*

292.    The Company continued:

> According to the information available to the Company described above, under the payment scheme, a large number of contractors and suppliers colluded with the former Petrobras personnel to overcharge Petrobras under construction contracts and contracts to provide Petrobras with goods and services, and used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or the former Petrobras personnel.
>
> *In particular, the former Chief Downstream Officer, the former Chief Services Officer and the former executive manager of the Services area of Petrobras were involved in the payment scheme. Those individuals, who were all in positions of authority at Petrobras, not only failed to report the existence of the cartel, but they also used their influence to further the objectives of the payment scheme, primarily by ensuring that the cartel members would be selected to participate in bidding rounds for goods and services contracts with Petrobras so that the cartel members would secure contracts with the Company.* . . . .
>
> In addition to the payment scheme, the investigations identified several other specific instances in which Petrobras was overcharged in connection with the acquisition of property, plant and equipment.  The amount that Petrobras was overcharged was used to make unrelated payments to Petrobras personnel.

293.    Petrobras' own words thus make it abundantly clear that its top executives not only knew about, but were in fact an essential part of, the massive kickback and bribery scheme that rendered Petrobras' representations set forth above to be materially false and misleading.

294.    In addition to Petrobras' public *mea culpa*, testimony and documents provided to Brazilian prosecutors by individuals involved in the scheme verify that the scheme pervaded the highest levels of Petrobras' management.

295.    Costa was Petrobras' Chief Downstream/Supply Officer from 2004 through 2012. As such, he was in charge of, among other things, the development of Petrobras' two new refineries, Abreu and Comperj.

296.    Costa testified that he was involved in the massive kickback and bribery scheme during his entire tenure as Chief Downstream/Supply Officer.   He has provided Brazilian prosecutors with comprehensive details of how the construction and engineering companies formed a cartel designed to inflate the price of Petrobras' projects, how the cartel kicked back 3% of the contract prices to Petrobras executives and their political godfathers, and how he personally received tens of millions of dollars in bribes.

297.    Costa has also disclosed the involvement of other senior Petrobras executives in the kickback and bribery scheme.   According to Costa, at the very least, the Chief Services Officer and the Chief International Officer also participated in the scheme and received bribes:

> **Federal Judge**:  This . . . cartelization and that payment of the 3%, was that also something that existed in other departments [of Petrobras]?
>
> **Costa**:  Yes.  Precisely.
>
> **Federal Judge**:   Do you know whether other directors, like yourself, also received amounts?
>
> **Costa**:  There was, in the service area there was the director Duque . . . .   In the International Department, it was Nestor Cerveró . . . .
>
> **Federal Judge**:   But do you know whether, for example, Mr. Nestor Cerveró and Mr. Renate Duque also personally received amounts?
>
> **Costa**:   Well, it was the subject of conversations within the company and it was clear that they did.  Yes, the answer is yes.
>
> **Federal Judge**:   Then that 3% existed in all, in these three departments, at least?
>
> **Costa**:  Correct.

298.    Costa's testimony is corroborated by the collaboration statement of Barusco, who was a senior executive in the Services Division.  The Services Division was responsible for 90% of procurement contracts at Petrobras, setting the basic budget for projects, selecting the bidders, and then negotiating with the preselected cartel member on the final inflated price to be paid by Petrobras.  According to Barusco, both Duque and he received bribes from the cartel.

299.    Petrobras benefited from these kickbacks because they allowed it to curry favor with its political masters.  Because, in addition to the Petrobras executives, members of the ruling parties also received substantial sums from the kickbacks, the scheme enabled Petrobras to operate with the support of the Brazilian federal government.

300.    Youssef, who was responsible for laundering the kickbacks through offshore accounts, stated in his cooperation statement that the kickback scheme went beyond Costa, Duque and Cerveró.  According to Youssef, the scheme was also well known to the President of Petrobras and to the office of the President of Brazil, whose political party (the PT) received massive amounts of money from the kickback scheme.

301.    Petrobras' Diretoria – of which Gabrielli, Foster, Costa, Duque, Cerveró, and Zelada were all members at various times – was responsible for signing off on all of Petrobras' major contracts and preparing Petrobras' financial statements.  According to Barusco, the cartel contracts were sent to the Diretoria for review.  Indeed, in February 2013, Foster told investors that the Diretoria met "twice weekly to focus on the physical and financial monitoring of the principal projects" of Petrobras.  Thus, the individuals at Petrobras responsible for issuing the false and misleading statements described above were the same individuals who had knowledge of their false and misleading nature.

302.    The involvement and knowledge of Petrobras' senior management in the massive kickback and bribery scheme is further evidenced by the scores of arrests, indictments, and convictions in Operation Lava Jato.

303.    Costa was arrested in March 2014.  He pled guilty to bribery and corruption and was sentenced to seven years, although he will not actually serve any prison time as a result of his cooperation.

304.    Duque was arrested in November 2014 and formally indicted in December 2014. In September 2015, he was sentenced to more than 20 years in prison.

305.    Cerveró was arrested in January 2015.  He was convicted of money laundering and sentenced to five years in prison.

306.    Cerveró's successor as Petrobras' Chief International Officer, Zelada, was arrested by Brazilian authorities in July 2015 and was indicted in August 2015 for receiving bribes.

307.    In addition to the criminal prosecution of members of Petrobras' Diretoria, Petrobras' scienter is further established by the complete overhaul of the Diretoria in February 2015.   On February 4, 2015, Petrobras announced the abrupt resignations of most of the members of the Diretoria, including CEO Foster, CFO Barbassa, Chief Downstream/Supply Officer Cosenza, Chief Exploration and Production Officer José Miranda Formigli, Chief Gas and Power Officer José Alcides Santoro, and Chief Engineering, Technology and Procurement Officer Figueiredo

308.    Rather than address allegations of corruption raised by lower-level employees, Petrobras executives turned a blind eye to such complaints and even attempted to silence the employees who raised them.  As explained in more detail above, Sá complained to Gabrielli and

Duque of irregularities in the Company's procurement process in 2008 and 2009, but was marginalized by those leaders after he pressed the issue.  Fonseca raised more than one hundred complaints about inflated contracts – and told Foster directly about the scheme – but her efforts were ignored and she was ultimately transferred to Singapore.

309.    Petrobras' scienter is also demonstrated by the remedial efforts and internal control changes it has recently implemented.

310.    On November 25, 2014, Petrobras' Conselho de Administração created a new position on the Diretoria – an Executive Director of Governance, Risk and Compliance – to "support[] the Company's compliance programs and mitigate[e] risks in its activities, including fraud and corruption."   "[T]he Executive Director of Governance, Risk and Compliance will participate in the decisions of the [Diretoria], and any subjects submitted to the [Diretoria] for approval must previously be approved by this Director as they relate to governance, risk and compliance."

311.    The fact that Petrobras created this new position on the Diretoria demonstrates its knowledge of the ineffectiveness of its existing internal controls.

312.    Petrobras also hired two reputable law firms to conduct an internal investigation and created a "Special Committee" to report directly to the Conselho de Administração on the progress of the internal investigation.

313.    Petrobras has implemented improvements in its complaint hotline and enhanced its protections for whistleblowers.

314.    Petrobras has updated its "procurement guidelines and corporate procedures" to "require an analysis of price proposals submitted by bidders, and a comparison with internal reference prices."  Petrobras was clearly aware that these necessary controls were not previously

in place at the time when its senior executives were conducting the massive kickback and bribery scheme.

315. Finally, Petrobras' scienter is demonstrated by the extraordinary scope of the massive kickback and bribery scheme. According to Costa, "every contract in every area . . . was subject to actions by the cartel and payment of bribery."

316. Petrobras has admitted that it entered into US$81.4 billion of contracts with cartel members between 2004 and April 2012.

317. Moreover, former Petrobras executives have admitted to accepting tens of millions of dollars in kickbacks.

318. Costa and Barusco have relinquished to authorities over US$125 million that they received in bribes.

319. In January 2015, Petrobras disclosed an estimation of a potential write-down of US$34 billion, an amount that is higher than Petrobras' reported gross profit for the entire 2013 fiscal year.

### B. Foster's Individual Scienter

320. Foster knew about or recklessly disregarded the massive kickback and bribery scheme at Petrobras when she signed Petrobras' 2011, 2012, 2013 annual reports and certified to the accuracy of Petrobras' financial reporting and the effectiveness of its internal controls.

321. Foster served on the Diretoria between 2007 and 2015, first as the Chief Gas and Power Officer and then as CEO. In that position, she was responsible for, among other things, approving the inflated cartel contracts.

322. Foster was directly informed of the irregularities in cartel contracts by Fonseca. In 2008 Fonseca met with Foster and told her about overpayments by Petrobras to cartel

members and payments that Petrobras had made for services that it never received. According to Fonseca, she "met with the CEO personally when she was director of the gas and energy unit. At that time, we discussed the matter. I handed over to her the documents about the complaints." Fonseca continued: "Afterward, she had access to these anomalies at the management meetings."

323. The following year, on April 3, 2009, Fonseca sent an email to Foster again apprising Foster of problems in the Downstream Division and also informing her of a significant increase in amounts being paid in connection with the Abreu refinery.

324. On October 7, 2011, Fonseca again wrote to Foster. Fonseca told Foster: "From the immense pride that I had for my company, I started to feel ashamed." She continued, "Directors start acting as gods and treating people like animals. What happened in the Abast [the Downstream Division] in the area of communications and works was an absolute nonsense." Fonseca concluded: "Some of it I know you already know. I would like to hear you before I take the next step."

325. Foster thus was fully apprised of the massive kickback scheme that existed at Petrobras. Despite this knowledge, she continued to make public statements to investors denying any corruption at Petrobras, even after Costa had been arrested. For example, on May 12, 2014, she wrote to investors: "I would like to register, once again, the commitment of Petrobras['] Executive Board and of its employees with ethics and transparency at our organization . . . ." On a phone call with investors later that day, Foster stated emphatically that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras." These statements, in the face of her personal knowledge to the contrary, at the very least demonstrate a reckless disregard for the truth by Foster.

326.    According to *Reuters*, Foster attempted to voluntarily resign in December 2014, but President Rousseff ordered her to stay as CEO.  Foster told reporters:  "***I need to be investigated***, we all need to be investigated . . . ."

327.    Indeed, the stress of leading a secretly corrupt entity clearly weighed on Foster.  In 2012, she told the *Financial Times*:  "Power doesn't come by itself, it comes with responsibility and it's the responsibility I live with, ***which weighs on me, which wakes me up at two o'clock in the morning***, takes me away from my friends, and makes me a more impatient and irritable person."

## VII.   PRESUMPTION OF RELIANCE APPLICABLE TO THE EXCHANGE ACT CLAIMS

328.    In asserting its Exchange Act claims, Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Petrobras Common ADS and Preferred ADS traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Petrobras securities and to inflate the market price of the securities; and (e) Plaintiffs purchased the Common ADS and Preferred ADS, through their investment advisors, between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were fully disclosed, without knowledge of the misrepresented or omitted facts.

329.    The markets for Petrobras Common ADS and Preferred ADS were open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Petrobras securities traded at artificially

inflated prices during the relevant period.  The artificial inflation continued until January 27, 2015.

330.    At all relevant times, the markets for Petrobras securities were efficient for the following reasons, among others:  (a) Petrobras filed periodic reports with the SEC; (b) the Common ADS and the Preferred ADS were listed and actively traded on the NYSE, a well-known, efficient market; (c) numerous analysts followed Petrobras, including analysts from BofA Merrill Lynch, Morgan Stanley and J.P. Morgan; and (d) Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

331.    Plaintiffs, through their investment advisors, purchased Petrobras Common ADS and the Preferred ADS in reliance on the market price of those securities, which reflected all the information in the market, including the materially false and misleading statements by Defendants.

## VIII.   LOSS CAUSATION WITH RESPECT TO THE EXCHANGE ACT CLAIMS

332.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Petrobras Common ADS and Preferred ADS, as described above in paragraphs 23 through 26 and Exhibits A and B, the market prices of those securities were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As a series of partial disclosures about the scope of the massive kickback and bribery scheme at Petrobras ebbed out to the market, the price of those securities dropped, as detailed above in paragraphs 174 through 224, and Plaintiffs were damaged.

333.    Moreover, the price drops detailed above in paragraphs 174 through 224 reflected the gradual materialization of the risk that Petrobras did not have adequate internal controls to ensure the integrity and accuracy of its financial reporting or adequately enforced policies to prevent bribery.

334.    In light of general investor concerns about Petrobras, Petrobras desperately sought to reassure investors that its internal controls, corporate governance practices, and ethics policies were of the highest order.  In doing so, the Company concealed the foreseeable risk that its utter lack of meaningful controls would enable corrupt members of senior management to engage in a massive kickback and bribery scheme leading to the falsification of the Company's reported assets and other financial metrics.  Beginning in 2014 and stretching into 2015, that foreseeable risk gradually materialized, culminating in the Company announcing that its prior financial statements were overstated and that it would have to record a write-down/impairment of its assets amounting to billions of dollars, and causing the Petrobras Common ADS and Preferred ADS held by Plaintiffs to decline as detailed above in paragraphs 174 through 224.

## IX.    NO SAFE HARBOR

335.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## X.   EXCHANGE ACT CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendants Petrobras and Foster**

336.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

337.   This Cause of Action is asserted against Petrobras and Foster for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

338.   Defendants Petrobras and Foster both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Petrobras securities; and (iii) cause Plaintiffs to purchase Petrobras Common ADS and Preferred ADS, through their investment advisors, at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

339.   Defendants Petrobras and Foster both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged

in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Petrobras Common ADS and Preferred ADS in an effort to artificially inflate and maintain the market prices for Petrobras Common ADS and Preferred ADS in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

340.     By virtue of their high-level position at the Company, Petrobras' executives were authorized to make public statements, and made public statements on Petrobras' behalf.  These executives were privy to and participated in the creation, development, and issuance of the materiality false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

341.     In addition, Petrobras and Foster had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to the Company's operations, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

342.     Petrobras and Foster acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Petrobras' and Foster's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Petrobras' operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its securities.

343.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Petrobras'

securities.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Petrobras, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Petrobras and Foster but not disclosed in public statements by Petrobras or Foster, Plaintiffs purchased Petrobras' Common ADS and Preferred ADS at artificially inflated prices.  As the truth eventually emerged, the price of Petrobras' securities substantially declined.

344.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Petrobras, which was concealed by Petrobras and Foster, Plaintiffs would not have purchased Petrobras Common ADS and Preferred ADS, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

345.    By virtue of the foregoing, Petrobras and Foster have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

346.    As a direct and proximate result of Petrobras' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's securities.

347.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act**
**Against Foster**

348.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

349.    To the extent that Defendant Foster is not found to be liable for any of the statements in the First Cause of Action above, this Cause of Action is asserted in the alternative against Foster and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

350.    Foster was at the time of the wrongs alleged herein a controlling person of Petrobras within the meaning of Section 20(a) of the Exchange Act.  As the Chief Gas and Power Officer of Petrobras between 2007 and 2012, and then as the CEO of Petrobras between 2012 and 2015, Foster exercised substantial control over Petrobras' business.  Foster at all relevant times participated in the operation and management of Petrobras, and conducted and participated, directly and indirectly, in the conduct of Petrobras' business affairs.

351.    Foster had the power and influence, and did in fact exercise that power and influence, to cause Petrobras to issue the statements set forth above.

352.    By reason of the conduct alleged in First Cause of Action, Petrobras is liable for violations of Section 10(b) and Rule 10b-5 promulgated thereunder, and Foster is liable based on her control of Petrobras.

353.    Foster culpably participated in Petrobras' violation of Section 10(b) and Rule 10b-5.  Foster was directly informed of the irregularities in cartel contracts by Fonseca.  In 2008 Fonseca met with Foster and told her about overpayments by Petrobras to cartel members and payments that Petrobras had made for services that it never received.  Fonseca made similar

complaints to Foster in 2009 and 2011.  In her role on the Petrobras Diretoria, Foster had both

the authority and the obligation to end the massive kickback and bribery scheme at Petrobras.

However, Foster chose to facilitate that scheme rather than put a stop to it.

354.     Foster is liable for the aforesaid wrongful conduct, and is liable to Plaintiffs for

the substantial damages which they suffered in connection with their purchases of Petrobras

Common ADS and Preferred ADS.

355.     Plaintiffs have brought this claim within two years of discovery of the violations

alleged herein, and within five years of the violations alleged herein.  Consequently, this action is

timely.

## XI.   SECURITIES ACT CLAIMS

356.     In this part of the Complaint, Plaintiffs assert strict liability and negligence claims

based on the Securities Act.

357.     Plaintiffs' Securities Act causes of action are not based on any allegations of

knowing or reckless misconduct on behalf of Petrobras and Foster.

358.     Plaintiffs' Securities Act causes of action do not allege, and do not sound in,

fraud.

## XII.   MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE SECURITIES ACT CLAIMS

359.     On or around March 10, 2014, Petrobras and PGF conducted a public offering of

approximately $8.5 billion in debt securities.

360.     Petrobras and PGF conducted the March 2014 Offering pursuant to a prospectus

supplement dated March 10, 2014, which was filed pursuant to a shelf registration statement and

prospectus filed on Form F-3ASR with the SEC on August 29, 2012 (collectively, the "Offering

Documents"), and was signed by, among others, Defendant Foster.

361.   The Underwriter Defendants acted as underwriters for the March 2014 Offering.

362.   Petrobras and PGF materially misreported Petrobras' financial information in the Offering Documents.

363.   Petrobras materially overstated the amount of its assets, PP&E and net income, and understated its costs and expenses, in the Offering Documents.   The amounts misreported by Petrobras in the Selected Financial and Operating Information section of the March 10, 2014 prospectus supplement were as follows:

| | For the year ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2010** | **2009** |
| **Assets (in billions)** | US$321.423 | US$327.396 | US$316.414 | US$310.194 | US$199.442 |
| **PP&E (in billions)** | US$227.901 | US$204.901 | US$182.918 | US$168.104 | US$128.754 |
| **Net Income (in billions)** | US$11.094 | US$11.034 | US$20.121 | US$20.055 | US$15.308 |

364.   The March 10, 2014 prospectus supplement also incorporated by reference the false and misleading financial information contained in Petrobras' annual report on Form 20-F for the year ended December 31, 2012 (the "2012 Annual Report"), and in Petrobras' quarterly report on Form 6-K furnished to the SEC on February 26, 2014 (the "2013 Fourth Quarter Report").

365.   In the 2012 Annual Report, Petrobras materially misreported assets as US$331.645 billion, PP&E as US$204.901 billion, year-to-date net income of US$11.034 billion, and year-to-date costs & expenses of US$110.102 billion.

366.   In the 2013 Fourth Quarter Report, Petrobras materially misreported assets as US$321.423 billion, PP&E as US$227.901 billion, year-to-date net income of US$11.094 billion, and year-to-date costs & expenses of US$125.768 billion.

367. The total assets, PP&E, and net income equity that Petrobras and PGF reported in these financial statements were materially overstated, and Petrobras' costs and expenses were materially understated, because Petrobras improperly capitalized the billions of dollars that it overpaid to its contractors.

368. Indeed, Petrobras has conceded as such in subsequent filings. In its annual report for the year ended December 31, 2014, which was filed with the SEC on May 15, 2015, Petrobras admitted the following:

> [A] large number of contractors and suppliers . . . overcharge[d] Petrobras under construction contracts and contracts to provide Petrobras with goods and services . . . .
>
> . . .
>
> Based on the available information described above, the Company [has] concluded that the portion of the costs incurred to build its property, plant and equipment that resulted from contractors and suppliers . . . overcharging the Company . . . should not have been capitalized.

369. Although Petrobras has stated that it is "impracticable" to quantify the exact amount of the overpayments that should not have been capitalized, it is clear from the testimony of Costa, Barusco and Youssef that Petrobras paid around 20% over its basic budget on certain contracts when a competitive bidding process would have yielded a radically lower contract price. Petrobras has identified at least US$81.440 billion of contracts implicated. Thus, Petrobras radically overpaid to the tune of billions of dollars. Indeed, one Petrobras estimate calculates the carrying value of certain assets subject to implicated contracts is overstated by US$34 billion.

370. Petrobras also paid for inflated contract prices on other projects. These overpayments also should not have been capitalized by Petrobras.

371.    The overpayments violated both U.S. and international generally accepted accounting principles described above in paragraphs 86 through 92.   The overpayments by Petrobras were not costs necessary to bring Petrobras' assets to working condition and provided no future economic benefit to Petrobras.   Thus, they should have been recorded as expenses rather than capitalized as assets.

372.    By wrongfully recognizing the overpayments as assets instead of expenses, Petrobras materially overstated the amount of its assets and PP&E in its financial statements. Furthermore, Petrobras misreported its net income in its financial statements by failing to record an impairment loss.   Finally, Petrobras understated its costs and expenses in its financial statements.

373.    In its 2012 Annual Report, Petrobras stated that:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

374.    This statement was materially false and misleading for the reasons described above in paragraphs 367 through 372.

375.    The Offering Documents contained a statement that the financial information contained therein was prepared in accordance with International Financial Reporting Standards. Similarly, Petrobras' 2012 Annual Report and its 2013 Fourth Quarter Report contained a statement that those documents were prepared or presented "in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB)."  These statements were materially false and misleading for the reasons described above in paragraphs 367 through 372.

-96-

376.    Moreover, Petrobras' CEO and CFO filed materially false and misleading certifications with the 2012 Annual Report in which they stated that such report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that the financial statements therein "fairly present in all material respects the financial condition, results of operations and cash flows of the Company."   These statements were materially false and misleading for the reasons described above in paragraphs 367 through 372.

377.    In its 2012 Annual Report, Petrobras' CEO and CFO filed certifications concerning the purported effectiveness of Petrobras' internal controls and disclosure procedures.

378.    The CEO and CFO both certified that, among other things:

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

379.   The 2012 Annual Report also contained the following statement concerning the assessment of internal controls.

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2012, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2012.

380.   These statements were materially false and misleading.  The Company has since conceded that material weaknesses existed in its internal controls.  The Company summarized its findings as follows:

We have evaluated, with the participation of our [new] Chief Executive Officer and [new] Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of December 31, 2014. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that *as a result of the material weaknesses in our internal control over financial reporting* described below*, as of December 31, 2014 our disclosure controls and procedures were not effective* to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

381. In its 2014 annual report, Petrobras identified material weaknesses in: (1) management's override of controls; (2) controls related to PP&E; (3) review and approval of manual journal entries; (4) and access management and segregation of duties.

382. In particular, Petrobras described the material weaknesses in management's override of controls:

During 2014, our management identified certain decisions taken during the period between 2004 and April 2012, specifically relating to our large investment projects in the Exploration and Production, Refining, and Gas and Power business segments, that did not comply with our existing internal controls over the process of contracting services in these segments. The internal controls over contracting of services include procedures such as the Petrobras Contracting Manual (Manual da Petrobras de Contratação – MPC) and the Investment Projects Corporate Procedures (Sistemática Corporativa de Projetos de Investimento).

In some of our contracting processes, one or more senior managers, together with third parties (namely, some of the contractors and suppliers involved in the construction projects), colluded to eliminate, infringe upon, override or circumvent these controls, which resulted in the commission of wrongful acts contrary to our interests and policies. Our management has identified the following internal control deficiencies related to the failure to detect these acts that together constitute a material weakness in our control environment: (i) inadequate "tone at the

top" regarding internal controls; (ii) failure to communicate the ethical values prescribed in our Code of Conduct; and (iii) lack of an effective whistleblower program. These deficiencies contributed to our failure to prevent an overstatement of property, plant and equipment.

383.    The same material weaknesses in the Company's internal controls that rendered its disclosure controls and procedures ineffective as of December 31, 2014, also existed in 2012 and 2013.

## XIII.   SECURITIES ACT CAUSES OF ACTION

### THIRD CAUSE OF ACTION

#### Violations of Section 11 of the Securities Act
#### Against Petrobras, PGF, Foster, Helms and the Underwriter Defendants

384.    Plaintiffs repeat and reallege the allegations contained paragraphs in 15-244, 335, and 356-383 as if set forth fully herein.

385.    This Cause of Action is asserted against Petrobras, PGF, Foster, Helms and the Underwriter Defendants under Section 11 of the Securities Act, 15 U.S.C. § 77k.

386.    At the time of the March 2014 Offering, the Offering Documents and the documents incorporated therein by reference contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements therein not misleading.

387.    Petrobras and PGF were the registrants of the March 2014 Offering.

388.    Defendants Foster and Helms signed the registration statement for the March 2014 Offering.

389.    The Underwriter Defendants were underwriters of the March 2014 Offering.

390.    Plaintiffs purchased debt securities traceable to the March 2014 Offering and pursuant to the materially false and misleading Offering Documents. Specifically, the debt

securities offered in the March 2014 Offering each had a unique CUSIP.  One of those CUSIPs was US71647NAM11.  The Notes that Plaintiffs' purchased in April 2014, April 2015, and May 2015 had the CUSIP US71647NAM11.   Because Plaintiffs' Notes contained this CUSIP US71647NAM11, they are traceable to the March 2014 Offering.

391.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when they purchased or acquired the debt securities.

392.    The value of the debt securities issued in connection with the March 2014 Offering has declined substantially subsequent to the consummation of the Offering, and Plaintiffs have sustained damages.

393.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent.

394.    By reason of the foregoing, Defendants are liable for violations of Section 11 of the Securities Act.

395.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Notes being bona fide offered to the public.  Consequently, this action is timely.

## FOURTH CAUSE OF ACTION

### Violations of Section 15 of the Securities Act
### Against Foster

396.    Plaintiffs repeat and reallege the allegations contained in paragraphs 15-244, 335, and 356-396 as if set forth fully herein.

397.    To the extent that Defendant Foster is not found to be liable for any of the statements in the Third Cause of Action above, this Cause of Action is asserted in the alternative against Foster and is based upon Section 15 of the Securities Act, 15 U.S.C. § 78*o*.

398.    At all relevant times, Foster was a controlling person of Petrobras within the meaning of Section 15 of the Securities Act.  At the time of the March 2014 Offering, Foster was CEO of Petrobras.

399.    Foster at all relevant times participated in the operation and management of Petrobras, and conducted and participated, directly and indirectly, in the conduct of Petrobras' business affairs.  As an officer of a publicly owned company, Foster had a duty to disseminate accurate and truthful information with respect to Petrobras' financial condition and results of operations.  Because of her position of control and authority, Foster was able to, and did, control the contents of the Offering Documents, which contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements therein not misleading.  Indeed, Foster signed the August 29, 2012 shelf registration statement.

400.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Foster acted with scienter or fraudulent intent.

401.    By reason of the conduct alleged in Third Cause of Action, Petrobras is liable for violations of Section 11, and Foster is liable under Section 15 based on her control of Petrobras.

402.    Foster is liable for the aforesaid wrongful conduct, and is liable to Plaintiffs for the substantial damages which they suffered in connection with their purchases of Petrobras Notes.

403.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Petrobras Securities Litigation*, No.

1:14-cv-9662-JSR (S.D.N.Y.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Notes being bona fide offered to the public.  Consequently, this action is timely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a)  Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)  Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(c)  Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

The Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: November 19, 2015
         New York, New York

                                 LOWENSTEIN SANDLER LLP


                                 By:__/s/ Lawrence M. Rolnick_____
                                       Lawrence M. Rolnick
                                       Marc B. Kramer
                                       Michael J. Hampson
                                       1251 Avenue of the Americas
                                       New York, NY  10020
                                       Tel. 212.262.6700

                                       *Attorneys for Plaintiffs*